**Paul HERNANDEZ, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 1009–83.

Court of Criminal Appeals of Texas, En Banc.

Sept. 17, 1986.

**54**

Michael L. Brandes, Austin, for appellant.

Ronald Earle, Dist. Atty. and Ralph Graham, Asst. Dist. Atty., Austin, Robert Huttash, State's Atty., Austin, for the State.

## OPINION ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

TOM G. DAVIS, Judge.

Trial was before the jury[1] upon appellant's plea of not guilty to a charge of capital murder. V.T.C.A. Penal Code, Sec. 19.03(a)(2). After the jury found appellant guilty, the court, acting pursuant to V.T.C.A. Penal Code, Sec. 8.07(d), assessed punishment at life. The Court of Appeals for the Third Supreme Judicial District (Austin) affirmed appellant's conviction in an unpublished opinion, *Hernandez v. State*, No. 3–82–370, (Delivered September 21, 1983). We granted appellant's petition for discretionary review in order to examine the Court of Appeals' holding that appellant's trial counsel rendered effective assistance.

Following the Court of Appeals' decision, the United States Supreme Court handed down its opinion in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The opinion in *Strickland* established an authoritative federal constitutional standard for determining ineffectiveness of counsel and for ascertain-

---

**1.** Prior to trial the juvenile court waived jurisdiction and certified appellant, a fifteen-year-old juvenile, for criminal prosecution.

ing when such ineffectiveness is prejudicial.

Accordingly, prior to examining the facts of the instant case, we determine whether under Art. I, Sec. 10 of the Texas Constitution and Art. 1.05, V.A.C.C.P. we must apply higher standards than those enumerated in *Strickland.*

With respect to determining ineffectiveness, the general standard established in *Strickland* differs little or not at all from this Court's standard, which in turn is based on Fifth Circuit precedents.

In *Ex parte Duffy,* 607 S.W.2d 507 (Tex. Cr.App.1980), and its progeny we stressed that effective counsel is counsel "rendering and likely to render" reasonably effective assistance.

The Supreme Court in *Strickland* noted: "As all the Federal Courts of Appeals have now held, the proper standard for attorney performance is that of reasonably effective assistance ... When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness.

"More specific guidelines are not appropriate ... The proper measure of attorney performance remains simply reasonableness under prevailing professional norms ...

" ... A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance ... [T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." 104 S.Ct. at 2064–66.

Since we find that the *threshold standard* for determining effective assistance of counsel enunciated in *Strickland* is not substantively different from the standard this Court has propounded in recent years, there is no reason for refusing to apply the *Strickland* standard to cases arising under Art. I, Sec. 10 of the Texas Constitution or Art. 1.05, V.A.C.C.P.

The test for determining prejudice or reversible error resulting from ineffective assistance of counsel was also spelled out in *Strickland:*

" ... The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 104 S.Ct. at 2068.[2]

This test, at least in certain circumstances, differs from the tests devised by our Court to determine prejudice in ineffective assistance cases. See, for example, *Ex parte Duffy,* supra, where we held, again based on Fifth Circuit precedent, that effective assistance was so important a right to a petitioner condemned to death that its infraction could never be treated as harmless error. Does our recent case law or the language and history of Art. I, Sec. 10, or Art. 1.05, V.A.C.C.P., suggest that a defendant should be put to a lesser standard of proof in establishing prejudice than the *Strickland* standard?

Starting with the opinion in *Caraway v. State,* 417 S.W.2d 159 (Tex.Cr.App.1967), this Court has consistently applied the test for effectiveness of counsel employed by the Fifth Circuit in *MacKenna v. Ellis,* 280 F.2d 592 (5th Cir.1960), cert. denied, 368 U.S. 877, 82 S.Ct. 121, 7 L.Ed.2d 78 (1961). That is, this Court has consistently and consciously applied a federal constitutional standard in all effectiveness cases and has utilized the standards enunciated by the Fifth Circuit in the absence of an authoritative and comprehensive opinion from the

**2.** The Supreme Court specifically rejected a stricter test that would have required a defendant to show that his counsel's deficient conduct *more likely than not* altered the outcome in the case.

Supreme Court. See *Mercado v. State*, 615 S.W.2d 225 (Tex.Cr.App.1981). In *Strickland*, the Supreme Court clearly set forth the federal constitutional standard to be followed.

As far as the language of Art. I, Sec. 10 is concerned (as well as the identical language in Art. 1.05, V.A.C.C.P.),[3] in no way can it be independently interpreted to provide greater protection for a defendant beset by ineffective assistance of counsel than the protection provided by *Strickland*. The language of Art. I, Sec. 10, insuring that a defendant "shall have the right of being heard by himself or counsel, or both," can be traced back to the 1836 Constitution of the Republic of Texas and was obviously modeled on the Sixth Amendment to the federal constitution[4] which guarantees the accused's right, "to have the Assistance of Counsel for his defense."

The Sixth Amendment right to be heard by counsel was originally understood, and understood throughout all of the 19th and the earlier part of the 20th century, to encompass the right of a defendant to retain counsel of his own choice for the preparation and trial of a case. The provision was *not yet* understood to include the right of an indigent defendant to have counsel appointed at State expense or the right of any defendant to enjoy effective assistance of counsel.[5]

The right to effective assistance of counsel as we understand it today *was derived from* the right to be heard by counsel.[6] Accordingly, in no sense can the language or intent of the framers of Art. I, Sec. 10, be interpreted to include a right to effective assistance of counsel greater than that provided by *Strickland*.

An examination of this Court's case law regarding effective assistance in the years before the Sixth Amendment was incorporated into the Fourteenth[7] and applied to the States only serves to buttress the point.

Ineffective counsel or counsel not permitted by the trial court to be effective was tantamount to no counsel at all and hence a violation of Art. I, Sec. 10. *Jones v. State*, 159 Tex.Cr.R. 526, 265 S.W.2d 116 (1954); *Turner v. State*, 91 Tex.Cr.R. 627, 241 S.W. 162 (1922). Even "no counsel at all," however, did not result in reversible error in the absence of a showing of harm. See *Fuller v. State*, 117 Tex.Cr.R. 558, 37 S.W.2d 156 (Tex.Cr.App.1931). See also *Fletcher v. State*, 396 S.W.2d 393 (Tex.Cr. App.1965), and *Jones v. State*, 388 S.W.2d 429 (Tex.Cr.App.1965), two cases decided shortly after *Gideon v. Wainwright*, supra, where a showing of harm was required of defendants asserting ineffective assistance claims.

In short, our constitutional and statutory provisions do not create a standard in

3. Art. 1.05, V.A.C.C.P., is in essentially the same form as predecessor statutes which date back to the 1911 Code of Criminal Procedure.

4. See G. Braden, et al (Eds), The Constitution of the State of Texas: An Annotated and Comparative Analysis, Pages 35–36 (1977).

5. See L. Jayson, et al (Eds.), The Constitution of the United States Of America: Analysis And Interpretation, Pages 1215–1216 (U.S. Government Printing Office) (7th ed. 1972); W. Beaney, The Right to Counsel in American Courts, Pages 22–28 (1955).

6. The Supreme Court first used the term "effectiveness" with respect to appointment of counsel in *Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932). That Court made clear in *Avery v. Alabama*, 308 U.S. 444, 60 S.Ct. 321, 84 L.Ed. 377 (1940), that Sixth Amendment right to counsel included the right to effective assistance

of counsel. See S. Krantz, et al, (Eds.), Right to Counsel in Criminal Cases, Page 166 (1976); and Waltz, *Inadequacy of Trial Representation As a Ground for Post-Conviction Relief In Criminal Cases*, 59 Nw.U.L. Review 289 at 293–295 (1964).

It is clear however that many courts entertained what amounted to ineffective assistance of counsel claims before this time, especially if counsel was appointed. See, for example, *Turner v. State*, 91 Tex.Cr.R. 627, 241 S.W. 162 (1922). As late as 1948, however, our Court refused to decide whether an accused with retained counsel could complain of ineffective assistance. *Ex parte Lovelady*, 152 Tex.Cr.R. 93, 207 S.W.2d 396 (1948). Further, we did not always state what constitutional or statutory provision guaranteed the right to effective assistance. See *Jones v. State*, 159 Tex.Cr.R. 526, 265 S.W.2d 116 (1954).

7. *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963).

ineffective assistance cases that is *more* protective of a defendant's rights than the standard put forward by the Supreme Court in *Strickland.* Accordingly, we will follow in full the *Strickland* standards in determining effective assistance and prejudice resulting therefrom.

Turning to the instant case, we summarize the facts relevant to appellant's ineffective assistance claim.

During the evening of June 2, 1977, appellant and two other youths, Michael Castro and Manuel Gonzales, unlawfully entered a habitation at 1607 East 11th Street in Austin. The youths were looking for bullets to use in a rifle they had been firing at fence posts earlier in the day. The youths found and appropriated some .22 caliber bullets during their search. Appellant confessed to loading the rifle, but trial testimony conflicted as to which of the boys loaded the rifle.

At some point during their wanderings in the house the youths came upon Domingo Vasquez, the deceased, and resident of the house, who was asleep under a pile of rags on the kitchen floor. Appellant and his cohorts discussed killing the deceased but decided against doing so.

Some time later, the youths returned to Vasquez and roused him from his sleep whereupon the old man chased the boys out of the house brandishing an ax.

The three youths stopped in the deceased's front yard. As the deceased came out of the front door, appellant shot him with the rifle.

Testimony differed as to whether Vasquez was still in the process of chasing the boys when shot or was instead in the process of returning to the inside of his home. The fatal shot, however, entered the deceased from the back and the testimony was undisputed that no barrier blocked the retreat of appellant and his friends.

After appellant shot the deceased he took the butt of the rifle and hit the deceased in the head as he tried to get up. The three youths then rifled through the deceased's pockets. Appellant and his friends were arrested the next day while attempting to burglarize another residence.

According to appellant, his trial counsel rendered ineffective assistance for three reasons: failure to pursue an insanity defense; presentation of evidence that rebutted the defense of self-defense; ignorance of the facts of the case and governing law.

Appellant contends that trial counsel improperly failed to pursue an insanity defense because of incomplete investigation. An insanity defense was purportedly warranted due to a psychological report filed by court psychologist D.I. Goldwater and due to testimony showing that appellant consumed a large amount of beer and sniffed paint on the day of the offense.

■ Appellant has not proffered any facts showing that trial counsel failed to thoroughly investigate an insanity defense. Admittedly this is often a difficult thing to do on direct appeal. We cannot, however, assume that because a record is silent as to the depth of an attorney's investigation of the insanity defense, he made no such investigation. Appellant is free to pursue his ineffectiveness claim on collateral review where the facts surrounding trial counsel's representation may be developed at a hearing.

Dr. Goldwater's report strongly suggested that with respect to certain of his communicative skills appellant, a fifteen year old, had the mental development of an eight and one half year old, and that appellant often acted impulsively. This alone does not prove that trial counsel failed to further investigate an insanity defense. Not mentioned by appellant are two reports in the appellate record sent to the Travis County District Attorney by Dr. Coons indicating that appellant was sane at the time of the offense and competent to stand trial.

As to appellant's consumption of beer and sniffing of paint and the relation of these to an insanity defense, V.T.C.A. Penal Code, Sec. 8.04, precludes the use of a voluntary intoxication-insanity defense to the commission of crime. See *Hawkins v. State,* 605 S.W.2d 586 (Tex.Cr.App.1980).

Trial counsel's purported presentation of evidence that rebutted the defense of self-defense involved the testimony of codefendant Michael Castro whose trial was severed from appellant's. Castro testified that he thought the deceased had abandoned his pursuit of appellant and friends at the time appellant shot him.

Trial counsel cross-examined and later called to the stand both Castro and Manuel Gonzales, the other accomplice. In many respects, counsel's cross-examination of Gonzales was effective, establishing that Gonzales and Castro were as much involved in ransacking the deceased's house as appellant and showing that Gonzales was afraid when the deceased chased them out of his house wielding an ax. The examination of Castro tended to support Gonzales' testimony until the former testified that the deceased had turned to go when appellant fired a shot. Medical testimony reflected that the deceased died from a bullet wound to the back.

■ Given the options available to trial counsel in a case where the evidence against his client was overwhelming, we cannot sit in hindsight and find ineffectiveness due to an error such as this, involving a calculated risk in examining a codefendant. The right to effective counsel is not the right to error-free counsel.

Trial counsel's supposed ignorance of the facts of the case and governing law takes several forms according to appellant.

■ In order to impeach Manuel Gonzales on cross-examination trial counsel introduced his written confession. The State contended, and the trial court agreed, that certain statements in the confession "opened up" extraneous offenses that the State could elaborate upon. These extraneous offenses were a previous burglary of the deceased's house and the attempted burglary the youths were engaged in on the day of their arrest. Even if counsel was ignorant of the law and ineffective in allowing these extraneous offenses to come in, there is no reasonable probability that the jury's verdict would have been different absent the mistake. The underlying burglary in the capital murder was over-

whelmingly established and ample evidence supported a conclusion that appellant and his friends were unsavory characters.

■ Likewise defense counsel's supposed ignorance of V.T.C.A. Family Code, Art. 51.09's requirement concerning a proper magistrate's warning could in no way have affected the jury's verdict. Defense counsel apparently did not realize that there were two warnings by two different magistrates in the instant case and that only the warnings administered when the defendant signed a waiver of his rights had to be given outside the presence of a police officer. The evidence however unequivocally established that no officer was present when appellant signed his waiver of rights.

Appellant chastises trial counsel for failing to subpoena witness Martin Rodriguez until the morning he was called to testify and witness John Reyes until the afternoon before he was slated to testify. Further, with respect to Rodriguez, trial counsel stated that he did not think his absence was, "really going to hurt the case, but I would like to have his testimony because it—something may come out." Rodriguez never testified but Reyes' written statement was admitted into evidence and stipulated to by both parties. Reyes' letter confirmed that the deceased carried an ax about him in order to protect himself.

■ Though trial counsel's behavior with respect to the subpoenas evidenced lack of preparedness, we cannot say on this record that there is a reasonable probability the result of the trial would have been different if counsel had seen to it that Rodriguez testified.

Finally, trial counsel's attempt to object to the charge revealed ineptness at preserving error.

Counsel's entire objection to the jury charge was as follows:

"[Defense Counsel]: Your Honor, I have no objections as such. However, I would like to have a charge included in here. And I will, of course, leave this to your discretion, but I'd like to have something

in here that indicates that if the defendant is not found guilty of the offense of capital murder that he may be reindicted—recharged on a charge of voluntary manslaughter.

"THE COURT: That request will be denied.

"[Defense Counsel]: Okay. And I'd move that the charges—

"I object to the charge on the ground that the issue is not sufficiently supported by the pleading and ask you to rule on that.

"THE COURT: All right, it will be overruled."

The best that can be said about the foregoing performance is that trial counsel was attempting in an inept fashion to obtain a charge on voluntary manslaughter or self-defense.

■ Once again, however, appellant has failed to establish prejudice. Appellant does not contend that the evidence supported a charge on voluntary manslaughter.[8] With respect to his claim of self-defense, evidence to support same was at best extremely weak. It was uncontradicted that nothing blocked appellant's retreat and that the deceased died from a bullet wound to the back. Moreover, appellant and his friends were in the course of burglarizing the deceased's home.

It is obvious from a review of the entire record that in certain respects trial counsel rendered sub-par assistance. But in the particular instances where this occurred, it has not been shown, as required by *Strickland*, that there is a reasonable probability, or a probability sufficient to undermine confidence in the outcome, that the result of the proceeding would have differed had trial counsel's assistance been effective.

Appellant is free to develop the facts further in a post-conviction habeas hearing, particularly with respect to counsel's alleged failure to pursue an insanity defense.

The judgment of the Court of Appeals is affirmed.

CAMPBELL, J., concurs in result.

CLINTON, Judge, concurring.

Discretionary review should not have been granted in this cause. Compounding that initial mistake, the majority decides an issue that is not before us, decides it wrongly, and then improperly applies the standard it has mistakenly adopted. Though the majority has (almost inadvertently) reached the correct result, I must protest virtually every step of the wayward course taken to that goal.

### I.

Among several good reasons for refusing review in this cause, most compelling is that appellant has presented no reason for such review. See Tex.Cr.App. Rule 302(c). Appellant does not claim the court of appeals' opinion is in conflict with that of another court of appeals, this Court, or any other court, statute, or rule of law. Appellant points out no deficiencies in trial counsel's performance. Instead, he argues to this Court only that "[a] close reading of the Record, Statement of Facts, Briefs, Opinion, and Appellant's Motion for Rehearing ... clearly demonstrate that Appellant's trial counsel, Paul Hanneman, was ineffective in his assistance to Appellant." This is insufficient under 304(d)(5), supra, to invoke this Court's discretionary jurisdiction, nor is any other reason readily apparent. The petition should be refused. *Degrate v. State,* 712 S.W.2d 755 (Tex.Cr. App.1986).

### II.

The issue seized upon by the majority, whether to "follow in full the *Strickland*

---

8. Nor would such a contention be correct. Appellant did not testify, and there was no evidence that he *indicated* to anybody that he had feelings of anger, rage, resentment, or terror at the time of the offense. See *Luck v. State,* 588 S.W.2d 371 (Tex.Cr.App.1979). Moreover, we do not believe that "sudden passion" arises from an "adequate cause" under V.T.C.A. Penal Code, Sec. 19.04, when a defendant is in the course of committing one of the underlying offenses delineated in V.T.C.A. Penal Code, Sec. 19.03(a)(2). See *Smith v. State,* 168 Tex.Cr.R. 102, 323 S.W.2d 443 (Tex.Cr.App.1959); *Leza v. State,* 149 Tex.Cr.R. 448, 195 S.W.2d 552 (1946); W. La-Fave and A. Scott, Jr., Criminal Law, Sec. 76 (1972).

standards in determining effective assistance and prejudice resulting therefrom," is not before this Court. The court of appeals' opinion was delivered September 21, 1983, and the petition for discretionary review filed little more than a month thereafter, both well before the opinion of the Supreme Court of the United States in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) [hereafter *Strickland*]. Thus the issue decided by the majority has not been briefed or argued by the parties, nor decided by the court of appeals. This not only goes well beyond this Court's mandate to "review decisions of the court[s] of appeals," Art. 44.45(a) and (b), it also denies the "adversarial testing" called for by *Strickland* itself. This is not only procedurally incorrect, it forces this Court to take upon itself the roles of both State's attorney and defense counsel as well as judge. I am compelled to dissent to this headlong rush to answer a question no party to this cause has posed. Lacking the benefits of a properly framed issue, a decision on that issue by the court of appeals, and arguments from both parties, we are in a poor position to decide this important question. It is no wonder, given this posture of the case, that the majority's conclusions are so weakly supported.

As appellant has been afforded no opportunity to answer the conclusions put forth in the majority opinion, I will point out one or two of the major flaws in its reasoning.

### III.

Most disturbing is the majority's pronouncement that "in no sense can the language or intent of the framers of Art. I, Sec. 10, be interpreted to include a right to effective assistance of counsel greater than that provided by *Strickland*." Op. at p. 56. This statement is particularly presumptuous in light of the fact that no one herein has advocated such an interpretation. The majority's statement therefore amounts to an assertion that it has considered all such arguments that could possibly be made and found them wanting. I make no effort to canvas such sweeping considerations. I do, however, find the majority's conclusion unsupported.

To begin with, the premise that the language of Art. I, Sec. 10 of the Texas Constitution "was obviously modeled on the Sixth Amendment to the federal constitution" has never been properly demonstrated.[1] While it is true that both Sec. 10 and the Sixth Amendment deal with the right to counsel, that alone is not strong indication that the later provision is modeled on the earlier. It is only indicative that forebearers insisted on assuring the right, taking statements designed to do so from any other reasonably accepted source. See *Brown v. State*, 657 S.W.2d 797, 801 (Tex. Cr.App.1983) (Concurring Opinion). It would be equally supportable to say the Texas "right to be heard" provision is modeled on the Connecticut constitution adopted in 1818.[2] Our provision is almost identical to the Connecticut provision, whereas our Art. I, § 10 is worded completely differently from the Sixth Amendment.

Detailed exegesis is inappropriate here, but to say that the Texas constitutional

---

1. The only authority cited for this proposition (majority opinion, n. 4) is unpersuasive. Mr. Braden makes just a bare assertion that "the similarity between [the Fifth and Sixth Amendments] and Section 10 is striking." He does not even claim that our original Texas constitutional provision was modeled on the federal one. Indeed, persuasive historical evidence exists that it was not: that Texians were influenced greatly by their Mexican experience is already documented, and its laws had trial procedures for defendant to be heard by himself and counsel. However, again, this is not a fit occasion to address the matter since it is not properly before the Court.

2. Article I, Section 10 of the Texas Constitution provides in pertinent part:
   "In all criminal prosecutions the accused shall have ... the right of being heard by himself or counsel, or both ..."
   The analogous Connecticut provision, Art. I, § 9, provides:
   "In all criminal prosecutions, the accused shall have a right to be heard by himself and by counsel ..."
   The Sixth Amendment to the Constitution of the United States, on the other hand, provides in pertinent part:
   "In all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence."

provision is "modeled on the Sixth Amendment" is irrelevant even if true. The fact that the framers of the Texas Constitution worded the provision differently at all, when they could have simply conformed our Bill of Rights to pertinent provisions of the U.S. Constitution, demonstrates that they had somewhat different guarantees in mind. So when addressing the issue of ineffective assistance of counsel as a matter of *state law* we need not follow slavishly the Supreme Court's interpretation of the Sixth Amendment, any more than we need adhere to the Connecticut courts' interpretation of their constitution. Just because language was once drawn from another source does not mean that we abdicate for all time our historical responsibility to interpret our own laws and Constitution. The majority's assertion at this late date that the provisions are in essence identical denigrates our own role as well as the efforts of the founders of this Republic and State.

Furthermore, to say that "this Court has consistently and consciously applied a federal constitutional standard in all effectiveness cases" (Maj. opinion, p. 55 ) is misleading at best. In *Caraway v. State,* 417 S.W.2d 159 (Tex.Cr.App.1967), which the majority cites as the beginning of this adoption of the federal standard, this Court was addressing a claim that the defendant had been denied his right to effective assistance of counsel "guaranteed to him by the 6th and 14th Amendments to the federal constitution." *Id.* at 163. No mention was made of the Texas Constitution, Article I, Section 10. In such a case it was of course appropriate to evaluate the claim in light of federal decisions interpreting the federal constitution.

However, when this Court in deciding a claim under *state* law approvingly cites language from a federal court opinion we do so only because we find the language helpful or the reasoning persuasive. In adopting the "reasonably likely to render and rendering reasonably effective assistance" test from *MacKenna v. Ellis,* 280 F.2d 592 (CA5 1960), cert. denied, 368 U.S. 877, 86 S.Ct. 121, 7 L.Ed.2d 78 (1961), we in no way bound ourselves to follow future pronouncements on the subject from the Fifth Circuit or any other federal court; not when we are interpreting Texas law. It means simply that we cast about for a "reasonably acceptable definition" of effective assistance of counsel, and having found one, made it our own. *Brown,* supra, (Concurring opinion). As Justice Hans Linde of the Oregon Supreme Court has stated:

> "This court like others has high respect for the opinions of the Supreme Court [of the United States], particularly when they provide insight into the origins of provisions common to the state and federal bills of rights rather than only a contemporary 'balance' of pragmatic considerations about which reasonable people may differ over time and among the several states. It is therefore to be expected that counsel and courts often will refer to federal decisions, or to commentary based on such decisions, even in debating an undecided issue under state law. Lest there be any doubt about it, when this court cites federal opinions in interpreting a provision of Oregon law, it does so because it finds the views there expressed persuasive, not because it considers itself bound to do so by its understanding of federal doctrines."

*State v. Kennedy,* 295 Or. 260, 666 P.2d 1316, 1321 (1983) (footnote omitted). This Court is of course possessed of similar autonomy.

## IV.

The first prong of the *Strickland* standard is the same as our own, whether counsel rendered "reasonably effective assistance." *Strickland,* however, represents the first time the Supreme Court of the United States has applied that standard, the first time that Court has "directly and fully addressed a claim of 'actual ineffectiveness' of counsel's assistance in a case going to trial." 104 S.Ct. at 2062. This Court, by contrast, has been faced often with the question of whether particular trial counsel rendered ineffective assistance. We have a well developed body of caselaw on the subject, applying our stan-

dard of reasonably effective assistance in a wide variety of contexts. We need not look to federal authority for other than "guidance" in applying that standard to the instant case.

Whether counsel rendered effective assistance is the only question before us in this case. The majority's adoption and application of *Strickland*'s "prejudice test" is unwarranted when neither appellant, the State, nor the court of appeals has done an analysis of the harm suffered by appellant due to the alleged failures of his trial counsel. Indeed, because the court of appeals found that appellant was rendered effective assistance of counsel, there was no need to address the question of harm. Nor is there a reason for this Court to do so. *See, Ingham v. State,* 679 S.W.2d 503, 508–09 (Tex.Cr.App.1984), in which this Court though "mindful" of the recent decision in *Strickland* found that "[w]e need not analyze this case in light of the two-pronged *Strickland* test, however, because we do not find that appellant's counsel was ineffective as our prior decisions construe that term or that he was not 'reasonably effective' as the Supreme Court construes that term."

As for the majority's assertion that our caselaw has never provided a higher standard of effective assistance than that of *Strickland,* I find the cases cited at page 56 not entirely supportive of that proposition:

*Jones v. State,* 159 Tex.Cr.R. 526, 265 S.W.2d 116 (1954), does not address Art. I § 10 and does not conclude that counsel's assistance was ineffective or amounted to "no counsel at all." *Turner v. State,* 91 Tex.Cr.R., 241 S.W. 162 (1922), does stand for the proposition for which it is cited, that Art. I § 10 was violated when an agent of the State prevented counsel from rendering effective assistance. The case was reversed without a showing of harm. Counsel was not allowed to talk to his client in private. When he finally got the opportunity, defendant told him of some evidence which counsel asked for a continuance in order to investigate. That was denied. What impact the evidence might have had on the case is not shown.

As for the cases cited for the proposition that a showing of harm was required before a conviction would be reversed for ineffective assistance, *Fuller v. State,* 117 Tex.Cr.R. 558, 37 S.W.2d 156 (1931), did not cite the Texas Constitution. The Court stated, "In a felony case of less than capital, the law does not make the presence of an attorney essential." *Id.,* 37 S.W.2d at 157. That has not been the law in this state since June 1, 1959, the effective date of an amendment to former Art. 494 of the Code of Criminal Procedure (now 26.04) requiring the appointment of counsel in all felony cases. That occurred four years before the Supreme Court applied this rule to the states through the Sixth and Fourteenth Amendments in *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). So for those four years, at least, Texas did provide that protection based solely on state law.

*Fletcher v. State,* 396 S.W.2d 393 (Tex. Cr.App.1965), as the majority says, came soon after the Sixth Amendment had been applied to the states through the Fourteenth by *Gideon,* supra. Perhaps for that reason, this Court addressed only a federal standard: "We are unable to agree that appellant was deprived of his constitutional rights as guaranteed by the 6th and 14th Amendments to the Constitution of the United States, or that a different result would have been reached by the jury but for any of the acts or omissions of his court appointed trial counsel." *Id.* at 396. There is no showing from the opinion that the defendant even made a claim under the laws or Constitution of Texas.

*Jones v. State,* 388 S.W.2d 429 (Tex.Cr. App.1965), is the most problematical of all, because it is difficult to tell for what proposition it stands. Among other things the Court there noted that the defendant "was represented at his trial by counsel of his own choosing ..." *Id.* at 430. This is no longer relevant after *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), abolishing the distinction in standards between retained and appointed

counsel. *See also Ex parte Duffy,* 607 S.W.2d 507, 509 (Tex.Cr.App.1980). *Jones* also states that counsel's failures to object to inadmissible evidence may have been trial strategy, before stating there was an abundance of other evidence to support the jury's verdict. Again, neither state nor federal law was explicitly cited.

These cases do not stand for the proposition that Texas constitutional and statutory law have never provided a higher standard of effective assistance than federal law. Nor is that issue before us. Until such time as a defendant claims that Texas law does provide such higher protection, we should not issue what is in effect an advisory opinion that it does not.

## V.

After its needless effort to justify adopting the *Strickland* prejudice test, the majority immediately demonstrates the folly of such an effort by improperly applying that test. Point by point, the majority isolates each failing of trial counsel and concludes that that particular failure did not undermine confidence in the result of the trial:

> "It is obvious from a review of the entire record that in certain respects trial counsel rendered sub-par assistance. But in the *particular instances* where this occurred, it has not been shown, as required by *Strickland,* that there is a reasonable probability, or a probability sufficient to undermine confidence in the outcome, that the result of the proceeding would have differed had trial counsel's assistance been effective."

Maj. opinion, p. 59.[3] But this is not the way to test appellant's claim of ineffective assistance, even under *Strickland.* Under that standard, appellant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 104 S.Ct. at 2068. It is the cumulative effect of counsel's errors that must be evaluated, not the effect of each individual error. "In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." 104 S.Ct. at 2069. The majority's weighing only of the individual impact of each individual error shows a basic misconception of the test the majority has erroneously followed. Such misconception demonstrates one of the difficulties inherent in applying another court's test rather than standards this Court has developed itself over the course of years.[4]

## VI.

Our grant of review was no broader than the ground for review. *Eisenhauer v. State,* 678 S.W.2d 947, 956 (Tex.Cr.App. 1984) (Clinton, J., dissenting). We did not grant review to decide whether we should adopt the nebulous standards of the Supreme Court of the United States as the law of this state governing ineffective assistance claims.[5] We granted appellant's petition only to review the court of appeals' decision, under applicable state law relied on by appellant and the State, that appellant was rendered effective assistance of counsel at trial. I agree with the majority that at least as far as this record indicates, he was. For example, in his supplemental

3. Emphasis here and throughout is supplied by the writer of this opinion.

4. The treatment of the individual claims occasionally leaves something to be desired as well, notably the majority's conclusion at p. 58 that "[e]ven if counsel was ignorant of the law and ineffective in allowing these extraneous offenses to come in, there is no reasonable probability that the jury's verdict would have been different absent the mistake. The underlying burglary in the capital murder was overwhelmingly established and ample evidence supported a conclusion that appellant and his friends were unsavory characters." Surely the majority does not

mean to hold that if the State offers sufficient evidence of the charged offense, and also proves incidentally that a defendant and his friends are "unsavory characters," admission of proof of extraneous offenses is harmless. But what else is to be made of this statement?

5. Understanding, of course, that the Sixth Amendment to the United States Constitution establishes the *minimum* standard of effective assistance and that this Court could not interpret Texas law to provide less protection. *Butler v. State,* 726 S.W.2d 151, n. 2 (Tex.Cr.App. 1986), reh. denied June 18, 1986.

brief to the court of appeals appellant argued, "The record is silent with no indication that defense counsel attempted to contact, interview or secure any psychiatric or psychological experts for the trial." Supplemental Brief, p. 9. But the burden to show that counsel did *not* thoroughly investigate the possibility of this viable defense is appellant's. We may not presume such lack of investigation from a silent record. As the majority properly points out, appellant is free to attempt to develop a record that more fully supports his claims by way of writ of habeas corpus.

Accordingly, while the majority has reached the correct result in this case, I deplore its decision of an issue not properly before us, and its gratuitous abdication of the duties and responsibilities of this Court.

Therefore, I concur only in the judgment of the court.

MILLER, J., joins this opinion.

TEAGUE, Judge, concurring and dissenting.

I reluctantly concur in the result that the majority reaches, that Hon. Paul Hanneman was not ineffective trial counsel for his client, Paul Hernandez, appellant, to the extent that appellant's conviction should be set aside. I must, however, dissent to the majority's application to this case of what the Supreme Court stated in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

DOES TEXAS HAVE A HIGHER STANDARD THAT GOVERNS INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS THAN THE FEDERAL CONSTITUTION MANDATES?

Notwithstanding that it might be true that "our constitutional and statutory provisions do not create [facially] a standard in ineffective assistance cases that is *more* protective of a defendant's rights than the standard put forward by the Supreme Court in *Strickland,*" this Court has in the past interpreted the Texas Constitutional and statutory provisions governing the right to the effective assistance of counsel

more broadly than was done in *Strickland,* see *Ex parte Duffy,* 607 S.W.2d 507, 516 (Tex.Cr.App.1980), which is constitutionally permissible because it is axiomatic that a state is free to interpret its own constitutional and statutory provisions more broadly than the Supreme Court holds to be necessary in construing the Federal Constitution. E.g., *Oregon v. Hass,* 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975). But a careful reading of *Strickland,* and comparing its teachings with what this Court has stated and held in the past, makes it apparent that the real issue presently before this Court is not whether the facial standard the Supreme Court adopted in *Strickland* should also be adopted by this Court, in making the determination whether Hanneman was ineffective counsel for appellant; the real issue presently before this Court is whether that standard should be applied differently.

If one will take the time to put the Supreme Court opinion of *Strickland v. Washington,* supra, alongside the majority's opinion, and compare the judicial teachings therein, I believe it will become quite apparent to anyone that the majority's opinion is nothing more than an effort to mimic what the Supreme Court stated in its dreadful and extremely horrifying opinion of *Strickland v. Washington,* supra, (horrifying to the extent of what dreadful consequences it will have when it comes to judging whether trial counsel was ineffective).

WHAT JUSTICE MARSHALL, WHO WAS A FINE TRIAL LAWYER AND APPELLATE JUDGE BEFORE HE BECAME A JUSTICE ON THE SUPREME COURT, HAS TO SAY ABOUT STRICKLAND

History teaches us that the Supreme Court in *Strickland v. Washington,* supra, "for the first time (in its entire history), attempt[ed] to synthesize and clarify those standards for distinguishing effective from inadequate assistance of counsel," but "[f]or the most part, [its] efforts are unhelpful ... To tell lawyers and the lower courts that counsel for a criminal defend-

ant must act like a reasonably competent attorney, ante, at 687 [104 S.Ct. at 2065], is to tell them almost nothing. In essence, the majority has instructed judges called upon to assess claims of ineffective assistance of counsel to advert to their own institutions regarding what constitutes 'professional' representation, and has discouraged them from trying to develop more detailed standards governing the performance of defense counsel." Marshall, J., dissenting opinion. In my view, this Court's majority opinion represents an abdication of this Court's responsibility to interpret the Texas Constitution.

## MY PREDICTION

I predict that except in the most egregiously defended criminal cases, the Supreme Court's decision of *Strickland v. Washington*, supra, also see *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), which is the companion case to *Strickland v. Washington*, supra, which the majority opinion does not cite or discuss in this cause, but which I shall, will have deleterious effects in the field of criminal law, regarding the issue of whether trial counsel was effective or ineffective counsel, much like its decision of *Dred Scott v. Sandford*, 50 U.S. (19 How.) 393, 15 L.Ed. 691 (1857), had on this country. As most of us remember, the *Dred Scott* decision held that "free" Negroes were not citizens of the United States, notwithstanding the fact that they had been born in the United States. The decision was a major factor in causing the Civil War between the States, which commenced in 1861 and lasted for four tragic years. In the classic words of Charles Evans Hughes, the *Dred Scott* decision was a "self-inflicted wound" by the Supreme Court that required more than ten years to heal. I fear that it will take ten-score years before the wound that *Strickland v. Washington*, supra, inflicts in the field of criminal law will heal because, for Sixth Amendment purposes, that decision is the death rattle for ineffective assistance of counsel claims by convicted persons. The representation of persons accused of committing criminal wrongs, especially indigent defendants, will, I predict,

long suffer as a result of the action that the Supreme Court took on May 14, 1984, when it handed down *Strickland v. Washington*, supra. Also see *United States v. Cronic*, supra.

## THE ACCUSATION AGAINST HANNEMAN

The record on appeal in this cause reflects that on direct appeal, in one ground of error, Hon. Michael L. Brandes and Hon. Betty B. Mackey, Austin attorneys, asserted that Hon. Paul Hanneman, another Austin attorney, who was retained to represent and did represent appellant at his trial, "rendered ineffective assistance of counsel" on behalf of appellant at his, appellant's, trial. The record on appeal also reflects that for a period of time when the case was on appeal Hanneman also represented appellant by court appointment. However, Hanneman withdrew from the case, "in agreement with the State Bar of Texas," after which Brandes was appointed by the trial court to represent appellant on appeal. How Mackey got into the case is not clear from the record, but such is immaterial to my discussion. In fairness to Hanneman, I must state that I do not find now or then that he was not qualified to practice criminal law in this State.

## THERE HAS BEEN NO HEARING ON THE ACCUSATION

I pause to point out that at no time has any type hearing been held on the accusation that Brandes and Mackey, either individually or jointly, have made against Hanneman; thus, in making the determination whether Hanneman was ineffective counsel when he represented appellant at his trial, this Court is without the benefit of Hanneman's testimony as to the accusation against him. In *Ex parte Duffy*, supra, this Court pointed out the following: "Experience has taught us that in most instances where the claim of ineffective assistance of counsel is raised, the record on direct appeal is simply not in a shape ... that would adequately reflect the failings of trial counsel ..., (nor, I might add, that would adequately reflect any defenses

that the charged attorney might have to the accusation of ineffectiveness). [C]ollateral attack may be just the vehicle by which a thorough and detailed examination of alleged ineffectiveness may be developed and spread upon a record." (607 S.W.2d 513).

## I WOULD, THEREFORE, REMAND THIS CAUSE FOR A HEARING, BUT THE MAJORITY REFUSES TO DO SO

Because we are without the benefit of Hanneman's testimony, as to his defenses, if any, to the accusation that has been leveled against him, this causes the record to be incomplete to really answer the question whether Hanneman was ineffective counsel when he represented appellant. Therefore, I vote to remand this cause to the trial court for a hearing on the accusation. Not to take this action is, in my view, not being fair to Hanneman, and to render an opinion on such a skimpy record as we have before us is also not being fair to the bench and bar of this State. But, the majority refuses to remand the cause for a hearing.

Notwithstanding this omission from the record on appeal, the court of appeals implicitly found and now this Court implicitly finds that there is a sufficient record to make the determination whether Hanneman was ineffective counsel. Thus, as the Court does not vote to remand the cause for a hearing, I will do the best I can with the record on appeal that is presently on file in this Court—for purposes of writing my concurring and dissenting opinion.

## WHY BRANDES AND MACKEY CLAIM HANNEMAN WAS INEFFECTIVE TRIAL COUNSEL

In their original appellate brief, Brandes and Mackey claimed that Hanneman was ineffective counsel because he "opened the door" to the admission into evidence of an extraneous offense through his introduction of the written confession of Manuel Gonzales, a co-defendant, at appellant's trial. However, the record does not, as we shall see, support this accusation. In a supplemental brief, Brandes added to why

he thought Hanneman was ineffective counsel. He asserted therein that Hanneman was ineffective counsel because he failed to pursue an insanity defense; presented evidence that rebutted the affirmative defense of self-defense; and was "ignorant of the facts of the case and governing law." With the exception of the assertion that concerns an extraneous offense, which I find has merit, I find that the other accusations are without merit. However, in light of the overwhelming evidence of appellant's guilt, and the fact that his punishment was automatically set under our law, I am unable to say that Hanneman's ineffectiveness regarding the extraneous offense was not harmless error.

Thus, whichever metaphor or label one chooses to use, in describing the standard for an attorney's trial performance, such as his performance made the trial a "farce and mockery," he was "grossly incompetent," his performance was "perfunctory," his performance was "prejudicial" to the best interests of the accused, he acted in "bad faith," his representation was a "sham and a pretense," his performance was "shocking to the conscience," his performance denied the accused "fundamental fairness," or his performance made the trial "a farce and mockery," after having carefully read the record on appeal, I am unable to conclude that Brandes and Mackey's complaints against Hanneman, including the one involving an extraneous offense, have sufficient merit that would warrant this Court to set aside appellant's conviction. Thus, the majority correctly holds that Hanneman was not ineffective counsel to such an extent that reversal of appellant's conviction is required.

## HANNEMAN DID NOT HAVE MUCH TO WORK WITH

The record on appeal actually reflects that in representing appellant, Hanneman had few, if any, favorable facts with which to muster a defense on behalf of appellant. As every practicing criminal attorney becomes aware in his or her professional career, "There are some cases that cannot be won, (in the sense of obtaining a not guilty

verdict from the fact finder). An attorney must appraise a case and do the best he can with the facts (with which he is presented)." *Rockwood v. State*, 524 S.W.2d 292, 293–294 (Tex.Cr.App.1975). Also, but as previously noted, the punishment that the trial judge imposed was automatically set by our law.

## BRANDES' CLAIM THAT HANNEMAN WAS INEFFECTIVE BECAUSE HE PRESENTED EVIDENCE THAT REBUTTED THE AFFIRMATIVE DEFENSE OF SELF-DEFENSE

As to Brandes' assertion that Hanneman was ineffective because he presented evidence during the trial that rebutted the affirmative defense of self-defense, try as I might, I have yet to find a scintilla of evidence that would support the defense of self-defense on the part of appellant, as provided by V.T.C.A., Penal Code, Section 9.31. To the contrary, it appears to me that if anyone had the right to use deadly force, it would have been Vasquez, the victim. See V.T.C.A., Penal Code, Section 9.41, defense of property. If it be Brandes' contention that because Vasquez commenced chasing appellant and his two cohorts from inside his residence, after he, Vasquez, was awakened by his unwelcome and uninvited intruders, that this gave appellant the right to shoot Vasquez in the back when he got to his front porch, I believe he misses the mark because, in a sense, it was appellant and his cohorts who, by their mere unlawful presence inside of Vasquez' residence, provoked Vasquez into chasing them. In any event, because appellant never established the defense of self-defense, this moots Brandes' contention because I am unable to understand how Hanneman's actions rebutted what never existed.

As to Brandes' last contention, regarding his assertion that Hanneman was ignorant of the facts of the case and governing law, I agree in principle with the reasons the majority states as to why this contention is without merit.

## BRANDES AND MACKEY'S CLAIM REGARDING AN EXTRANEOUS OFFENSE

The record on appeal reflects that Hanneman was both effective and ineffective counsel regarding the admission into evidence of an extraneous offense. This is because the record reflects that when Hanneman was cross-examining Gonzales, the State's accomplice witness, the witness unresponsively answered the following question as follows: "Q: Okay, then that morning, (when Gonzales was arrested), y'all were walking down the street and the police picked you up. Is that not correct? A: Yeah, *we were going inside this other house.*" [My Emphasis]. The latter portion of Gonzales' answer was unquestionably unresponsive to the question asked, and subject to an objection. However, Hanneman did not object. Thus, he was ineffective on this point. Thereafter, but based upon an incorrect representation by the prosecuting attorney of Hanneman's question, the trial judge erroneously overruled Hanneman's objection to the admission into evidence of the extraneous offense of attempted burglary of another house that occurred the morning after Vasquez was killed. In this regard, Hanneman was effective counsel. However, but without objection, the State later put on the arresting officer, who testified as to his response to a police dispatch about "a burglary then in progress." Thus, Hanneman's failure to object to the officer's testimony caused the error to be harmless. *Autry v. State*, 159 Tex.Cr.R. 419, 264 S.W.2d 735 (Tex.Cr.App. 1954). In this, he was ineffective counsel.

Notwithstanding this Court's decision of *Ewing v. State*, 549 S.W.2d 392 (Tex.Cr. App.1977), that such error on the part of Hanneman *might have been* "a question of tactic," I would hold, for the reasons that Judge Phillips stated in the dissenting opinion he filed in that cause, that Hanneman was ineffective for not objecting to the police officer's testimony concerning the extraneous offense. However, in light of the overwhelming evidence of appellant's guilt, I am unable to conclude, though not without some difficulty, that this single error causes him to become ineffective

counsel to such an extent that reversal of appellant's conviction is required. Although I am loathe to characterize or classify such error as harmless, because I believe that effective assistance of counsel is a "constitutional right so basic to a fair trial that [its] infraction [usually] can never be treated as harmless error," *Ex parte Duffy*, supra, 607 S.W.2d at 524, I am compelled to do so in this instance because the evidence in this non-death penalty case establishes beyond any doubt that appellant committed the capital murder of Vasquez, and the error had no affect whatsoever on the punishment that was assessed. See *Weathersby v. State*, 627 S.W.2d 729 (Tex.Cr.App.1982); *Allen v. State*, 552 S.W.2d 843, 844–846 (Tex.Cr.App.1977). E.g., *Schneble v. Florida*, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972); *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1972). Also see *Whitsell v. Perini*, 419 F.2d 95 (6th Cir. 1969). Cf. *Beasley v. United States*, 491 F.2d 687 (6th Cir.1974).

## BRANDES' FAULTING HANNEMAN FOR NOT PURSUING AN INSANITY DEFENSE

As to Brandes' faulting Hanneman for not "pursuing an insanity defense," other than admitting that he had consumed some beer, appellant himself testified at the pretrial hearing that was held on the admissibility of appellant's written confession, see *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), that he had not taken any drugs or sniffed any glue or paint the night before. Brandes, in support of his contention, however, relies upon a "psychological report" that was filed in Juvenile Court by D.L. Goldwater, a psychologist appointed by the Juvenile Court. The report is in the record on appeal. However, we do not have a transcription of the proceedings that occurred in Juvenile Court. Thus, I agree with Brandes that "Since the facts in this case remained covered and undetected, there is no way of telling whether these facts, (relating to the possible defense of insanity), if fully developed, would or would not have established the defense (of insanity) in dispute." (P. 10

of Supplemental Brief.) And this is another reason why a hearing should be held on the accusation.

Nevertheless, I have carefully searched the record for evidence that would establish that at the time of the commission of the offense the appellant, as a result of severe mental disease or defect, did not know that his conduct was wrong, see V.T. C.A., Penal Code, Section 8.01(a), which evidence is a prerequisite that must be established before the defense of insanity is raised. My search has been in vain. Brandes, in support of his contention that Hanneman was ineffective because he did not pursue the defense of insanity, seizes upon that part of Goldwater's report that states that appellant was grossly immature for his age, and that the " 'Dap' test, (draw a picture test), was of sufficient detail to yield a developmental age of approximate eight and one-half years." However, the fact that this might reflect or indicate that appellant might be mentally retarded does not reflect or indicate that he was suffering from mental disease or defect to such an extent that he did not know his conduct was wrong. My research has yet to reveal a single case where simply because the accused was immature, mentally deficient, or mentally retarded, that this, standing alone, is sufficient to raise the defense of insanity. Nor does Brandes cite such a case. By analogy, this Court, as well as the Federal courts, has held many times that a mentally deficient person is capable of waiving his right of self-incrimination. See *Grayson v. State*, 438 S.W.2d 553 (Tex. Cr.App.1969); *Lavallis v. Estelle*, 370 F.Supp. 238 (U.S.S.D.Tex.1974). Of course, if the mental subnormality is so great that an accused is incapable of understanding the meaning and effect of his confession, then it would not be admissible. *Casias v. State*, 452 S.W.2d 483 (Tex.Cr.App.1970). But that is not our case. Brandes' contention is without merit. Brandes also does not attack the admissibility of appellant's written confession on the ground that at the time appellant gave the confession he was so mentally defective that he was in-

capable of understanding the meaning and effect of his confession.

The majority, however, tells appellant that he is "free to develop the facts further in a post-conviction habeas hearing, *particularly with respect to counsel's alleged failure to pursue an insanity defense,*" (my emphasis), thus implying that Hanneman had a duty to investigate this defense. In light of the appellant's express and unequivocal testimony, that, other than beer, his body did not become subject to any other deleterious substance, and the fact that mental retardation, standing alone, is insufficient to raise the insanity defense, I strongly disagree that Hanneman had any duty to make an investigation regarding a possible insanity defense. The majority's implication will place an intolerable and unnecessary burden upon the bench and bar of this State, as well as the taxpayers of this State, which they can ill afford at this time.

## THE BIRTH OF THE RIGHT TO THE ASSISTANCE OF COUNSEL

In light of this Court's express approval of *Strickland v. Washington,* supra, I will next address the subject of the right to the effective assistance of counsel.

The birth of the right to the assistance of counsel, as guaranteed by the Sixth Amendment to the Federal Constitution, and made applicable to the States through the Fourteenth Amendment is, of course, a fascinating and interesting event in the history of the development of criminal law in this country. However, although the Sixth Amendment was declared in force on December 15, 1791, it was not until 1932, when the Supreme Court decided *Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932), that a person charged with committing a capital crime was given the right to the assistance of counsel, as guaranteed by the Sixth Amendment to the Federal Constitution, which right was made applicable to the States through the Fourteenth Amendment.

## THE FACTS THAT GAVE RISE TO POWELL V. ALABAMA

The facts that gave rise to the Supreme Court decision of *Powell v. Alabama,* su-pra, made it the ideal case for the Supreme Court to rule on such an important issue in our criminal jurisprudence. Eight of the nine defendants in that cause received the death penalty. After conviction, the case itself received an enormous amount of nationwide publicity, which in part was caused by a "fight" between the International Labor Defense of the Communist Party and the N.A.A.C.P., over which group would furnish legal representation for the defendants, which itself is rather interesting when one considers the fact that it appears that no lawyer really wanted to represent the defendants at their trials.

The incident that gave rise to a long series of trials and appeals of the "Scottsboro Boys" began on March 25, 1931, when the police arrested in Paint Rock, Alabama nine young black males, one of whom was 13 years of age and another who was only sixteen years of age, for the rape of a white female. The rape allegedly occurred on a "fast" freight train traveling between Chattanooga, Tennessee and Huntsville, Alabama. The train was stopped at Paint Rock by a deputy sheriff and a posse comitatus. The defendants stood trial in nearby Scottsboro, Alabama; thus, the name "Scottsboro Boys." None of the defendants were residents of the State of Alabama. It was later established that the victim was a well-known prostitute apparently traveling on the train with a "trick," and that she had fabricated her story that she had been raped to cover up the fact that she was illegally crossing state lines. Because the attitude of the community of Scottsboro, where the defendants were tried, was one of great hostility, to prevent a lynching the National Guard was called out. The National Guardsmen guarded the defendants, who were housed in Gadsden, Alabama during the pretrial and trial proceedings, as well as guarding the courthouse and the courthouse grounds located in Scottsboro, at every stage of the proceedings. See D. Carter, *Scottsboro, A Tragedy of the American South* (1979).

Six days later, on March 31st, the defendants were indicted and arraigned. The tri-

al judge *later stated* that at arraignment he had appointed *all* the members of the local bar for the purpose of arraigning the defendants. He also stated that he anticipated that the members of the bar would continue to help the defendants if no counsel appeared at the defendants' trials. On April 6th, the trials commenced, after the State's motion for severance was granted. Before the trials commenced, the trial judge engaged in a long colloquy with a lawyer from the State of Tennessee, who was not a member of the Alabama bar, to see whether he would appear as counsel for the defendants. The Tennessee lawyer stated that he had come "as a friend of the people who are interested and not as paid counsel" and that he was not familiar with Alabama procedure nor had he had a chance to prepare for the cases. He eventually took part in the trials in the capacity of an *amicus curiae*. A local lawyer volunteered to help the Tennessee lawyer. Another local lawyer, who had said he could not appear as counsel, but was willing to assist, suddenly became lead counsel. He and the Tennessee lawyer were assisted by another local lawyer who the judge apparently drafted into service, sua sponte. The trials then began. The defendants were tried in three separate groups, but apparently before three different juries sitting at the same time. The trials, which were attended by some eight to ten thousand persons, lasted only one day. A parade took place during the time the trials were occurring. The parade, complete with a band, was sponsored by The Ford Motor Company. When verdicts in the Weems and Norris' case were returned, the band played the tune "There'll Be A Hot Time In The Old Town Tonight." There was much applause from the spectators who were watching the parade. See *Patterson v. State*, 224 Ala. 531, 141 So. 195, 200 (Supr.1932). Also see Jethro K. Liberman, *Milestones* (1976).

As noted, eight of the defendants were convicted and given the death penalty. The jury which heard the thirteen-year-old's case was unable to reach a verdict. The prosecutor had asked that jury to assess the thirteen-year-old a life sentence;

however, seven of the twelve jurors wanted to impose the death penalty. It appears that this disagreement over what punishment to assess is what caused the jury in that case not to be able to reach a verdict.

On March 24, 1932, the Supreme Court of Alabama, in *Patterson v. State*, supra; *Powell et al. v. State*, 224 Ala. 540, 141 So. 201 (Supr.1932); *Weems et al. v. State*, 224 Ala. 524, 141 So. 215 (Supr.1932), affirmed all but the conviction of Williams, the sixteen year old, which it reversed because it held that Williams, a juvenile, should not have been tried as an adult. Only Chief Justice Anderson of the Alabama Supreme Court dissented. He believed that under the circumstances the defendants had been tried too quickly. In *Powell et al. v. State*, supra, the majority implicitly answered Judge Anderson's belief in these words: "The appellants complain of the speed of the trial. There is no merit in the complaint. If there was more speed, and less of delay in the administration of the criminal laws of the land, life and property would be infinitely safer, and greater respect would the criminally inclined have for the law." (141 So. at p. 211).

Analogizing to the trial of Czolgosz, the assassin who shot former President McKinley in Buffalo, New York on September 6, 1901, the majority found support for its holding that the trials were not too speedy. The majority pointed out that in that case only two months passed from the date of the shooting until Czolgosz was executed, and "This verdict, sentence, and execution were approved by good citizens, north, south, east and west, in fact on both sides of the Atlantic." (141 So. at p. 211).

## POWELL V. ALABAMA

With this backdrop, I now turn to the Supreme Court decision of *Powell v. Alabama*, supra.

On October 10, 1932, almost exactly six months from the day that the Alabama Supreme Court had denied rehearing, the Supreme Court heard oral argument. It decided the case on November 7, 1932, and restricted the issue to be decided to wheth-

er the defendants were in substance denied their right to counsel, "with the accustomed incidents of consultation and opportunity of preparation of trial." 53 S.Ct. 57. Thus, the focus of attention was not on what occurred during the trial, but on the actual amount of time allotted the attorneys for trial preparation. Cf. *United States v. Cronic,* supra.

The Court first held, however, that because the designation of counsel for the defendants was either so indefinite or so close upon the trials that such amounted to a denial of the effective and substantial aid of counsel. It further held that "[i]n any event, the [above] circumstance, [the designation of counsel], lends emphasis to the conclusion that during perhaps the most critical period of the proceedings against these defendants, that is to say, from the time of their arraignment until the beginning of their trials, when consultation, thorough-going investigation and preparation were vitally important, the defendants did not have the aid of counsel in any real sense, although they were entitled to such aid during that period as at the trial itself." (Citations omitted.) 53 S.Ct. at 60.

What appears to have troubled the Court the most was that, even assuming there was a proper designation of counsel on the morning of the trial, such would not have permitted counsel a sufficient period of time to investigate before going to trial. "[A] defendant, charged with a serious crime, must not be stripped of his right to have sufficient time to advise with counsel and prepare his defense." 53 S.Ct. at 60.

The Court next decided whether the denial of the assistance of counsel contravened the due process clause of the Fourteenth Amendment to the Federal Constitution. After tracing the historical roots of the right to counsel, the Court concluded that "the right to the aid of counsel is ... [a] fundamental right guaranteed by the due process clause of the Fourteenth Amendment ... We think the failure of the trial court to give [the defendants] reasonable time and opportunity to secure counsel was a clear denial of due process ... [I]n a capital case, where the defendant is unable to employ counsel, and is incapable adequately of making his own defense because of ignorance, feeble-mindedness, illiteracy, or the like, it is the duty of the court, whether requested or not, to assign counsel for him as a necessary requisite of due process of law; and that duty is not discharged by an assignment at such a time or under such circumstances as to preclude the giving of effective aid in the preparation of the case." 53 S.Ct. at 65.

Thus, in order for there to be due process of law, there must be a trial, but, standing alone, without the effective assistance of counsel, the trial would have little meaning or importance. Because the defendants had been denied the effective assistance of counsel, the Supreme Court ordered their convictions reversed.

## SUBSEQUENT HISTORY OF POWELL V. ALABAMA'S HOLDING

Notwithstanding that the question, whether a defendant has a constitutional right to the assistance of counsel in a non-capital case, was not answered in *Powell v. Alabama,* supra, in 1938, the Supreme Court held in *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), that a defendant in a *federal* criminal prosecution *was* entitled to the assistance of counsel and that, if unable to afford counsel, the trial court had an obligation to appoint him an attorney. Thus, the Sixth Amendment barred a conviction and sentence in a Federal criminal trial if the defendant was not represented by counsel and had not competently and intelligently waived his right to counsel. However, State defendants charged with non-capital offenses did not fare as well.

In *Betts v. Brady,* 316 U.S. 455, 62 S.Ct. 1252, 86 L.Ed. 1595 (1942), the Supreme Court rejected the claim that due process of law required the assistance of counsel in state proceedings as broad as that provided in the federal courts by the Sixth Amendment. "[T]he due process clause of the Fourteenth Amendment does not incorporate, as such, the specific guarantees found in the Sixth Amendment." 62 S.Ct. 1252, 1256. Thereafter, whether counsel was re-

quired in a non-capital felony case was decided on a case by case approach. Counsel was required to be appointed only when the particular circumstances of the case indicated that the absence of counsel would result in a lack of fundamental fairness.

In *Uveges v. Pennsylvania*, 335 U.S. 437, 69 S.Ct. 184, 93 L.Ed. 127 (1948), the question, whether counsel should be appointed, was framed as follows: "Whether the gravity of the crime and other factors— such as the age and education of the defendant, the conduct of the court or prosecuting officials, and the complicated nature of the offense charged and the possible defenses thereto—render criminal proceedings without counsel so apt to result in injustice as to be fundamentally unfair?" Also see *Gibbs v. Burke*, 337 U.S. 773, 69 S.Ct. 1247, 93 L.Ed. 1686 (1949).

In *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), the Supreme Court put to rest the above distinctions by overruling *Betts v. Brady*, supra, and held that the Sixth Amendment right to counsel was applicable to the States through the due process clause of the Fourteenth Amendment. Thus, the appointment of counsel was required in a state felony prosecution, as well as in a Federal felony prosecution, when the defendant could not afford to employ an attorney. Also see A. Lewis, *Gideon's Trumpet* (1966).

*Gideon v. Wainwright*, supra, was expanded in *Argersinger v. Hamlin*, 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972), to misdemeanors where the punishment exceeded six months. In *Scott v. Illinois*, 440 U.S. 367, 99 S.Ct. 1158, 59 L.Ed.2d 383 (1979), the Court held that where there was to be no confinement, the right to counsel did not attach. But in *Baldasar v. Illinois*, 446 U.S. 222, 100 S.Ct. 1585, 64 L.Ed.2d 169 (1980), the Supreme Court held that an uncounseled misdemeanor conviction without a jail sentence could not be used to convert a subsequent misdemeanor to a

felony offense that carried a prison term as punishment.

## ONE OF THE EFFECTS OF AFFORDING DEFENDANTS IN STATE COURTS THE RIGHT TO COUNSEL IS THE INCREASE IN CLAIMS THAT COUNSEL RENDERED INEFFECTIVE ASSISTANCE

Although the right to counsel in felony cases is now firmly established, the granting of such right to defendants, in particular indigent defendants, has brought on a proliferation of claims from convicted indigent defendants that counsel who represented them at trial were ineffective in defending them.

## BUT BARRIERS WERE QUICKLY ERECTED TO SUCH CLAIMS

Although this Court early on agreed that an accused person in a criminal proceeding has a constitutionally protected right to the effective assistance of counsel,[1] and the Legislature early on, see supra, statutorily provided indigent defendants with counsel, when it came to whether counsel was ineffective, this Court, as well as many others, succumbed to the early but later held to be erroneous view that the appointment of counsel was state action, whereas privately retained counsel did not implicate state action. See *Newton v. State*, 456 S.W.2d 939, 941 (Tex.Cr.App.1970); *Byrd v. State*, 421 S.W.2d 915 (Tex.Cr.App.1967). Thus, in making the determination whether counsel was ineffective, the distinction between retained counsel and court appointed counsel was drawn. *Gondek v. State*, 491 S.W.2d 676 (Tex.Cr.App.1973); *McKenzie v. State*, 450 S.W.2d 341 (Tex.Cr.App.1970). Today, however, notwithstanding that the attorney was retained, his effectiveness must meet the same degree of effectiveness as appointed counsel. See *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980); *Ex parte Duffy*, supra.

---

1. Since at least 1948, in capital cases, and since at least 1957, in non-capital cases, Texas has required that, when requested, indigents must be furnished counsel. See 28 *Tex.L.Rev.* 236 (1949); Morrison, "Requiring the Appointment of Counsel at Trial and on Appeal," 28 *Tex. Bar J.* 23 (1965); Onion, "The Right to Counsel," 28 *Tex. Bar J.* 357 (1965).

In this State, court appointed counsel was formerly held to a very high standard in order to be effective. In one of the few cases that this Court reversed on direct appeal in earlier times, involving court appointed counsel, this Court held in *Rodriguez v. State*, 170 Tex.Cr.R. 295, 340 S.W.2d 61 (1960), that "viewing the case as an over-all picture, we are constrained to conclude that equal justice under law would best be preserved and maintained by awarding appellant another trial." (64). "[W]hen from the entire record it is apparent that the accused has not been adequately represented the courts should have no hesitancy in so saying." (63). The answer to the question, whether court appointed counsel was ineffective in that case, turned upon several factors, namely: (1) the inexperience of the attorney in handling serious criminal cases; (2) his actions during the trial which permitted the State to introduce what would have been otherwise inadmissible evidence that was injurious to the defense. Interestingly, the dissent that was filed in that cause by Judge Woodley concluded that the majority was mandating higher qualifications for the representation of indigent defendants than was required for clients who had retained counsel. The dissent also would have held that the errors of commission that were made by court appointed counsel amounted to trial tactics on the part of the lawyer, and lastly would have held that such errors, if any, were harmless. E.g., *Fletcher v. State*, 396 S.W.2d 393 (Tex.Cr.App.1965). The majority, however, held that the defendant had not received the effective assistance of counsel, and reversed the defendant's conviction. This decision was hailed in many quarters. However, history and experience teaches us that it was not approved because many trial judges, including the one who had appointed counsel in *Rodriguez*, supra, refused to appoint other than experienced and older attorneys of the local bar to represent indigent defendants.

Nevertheless, when it came to court appointed counsel, this Court committed itself: "This Court does not hesitate to reverse a conviction where ineffectiveness of [court appointed] counsel is manifestly demonstrated." This Court also did not appear to apply the harmless error test to such errors of commission or omission on the part of counsel, if it found court appointed counsel ineffective, the conviction would be summarily reversed. See *Vessels v. State*, 432 S.W.2d 108 (Tex.Cr.App.1968) (On motion for rehearing).

It also appears from the decisions of this Court that this Court has consistently made the determination whether court appointed counsel was ineffective only after it had carefully reviewed the entire record on appeal, i.e., it viewed the claimed errors of commission or omission from the totality of the representation of the accused, rather than dissecting isolated failures by counsel to object, or isolated acts or omissions by counsel. In *Benoit v. State*, 561 S.W.2d 810 (Tex.Cr.App.1977), this Court stated the following: "Any claim of ineffective assistance of counsel must be determined upon the particular circumstances of each individual case." Also see *Ex parte Robinson*, 639 S.W.2d 953 (Tex.Cr.App.1983); *Ferguson v. State*, 639 S.W.2d 307 (Tex.Cr. App.1982); *Romo v. State*, 631 S.W.2d 504 (Tex.Cr.App.1982); *Boles v. State*, 598 S.W.2d 274 (Tex.Cr.App.1980); *Flores v. State*, 576 S.W.2d 632 (Tex.Cr.App.1979); *Ewing v. State*, 549 S.W.2d 392 (Tex.Cr. App.1977); *Long v. State*, 502 S.W.2d 139 (Tex.Cr.App.1973); *Nielson v. State*, 437 S.W.2d 862 (Tex.Cr.App.1969); *Garcia v. State*, 436 S.W.2d 911 (Tex.Cr.App.1969); *Caraway v. State*, 417 S.W.2d 159 (Tex.Cr. App.1967). And this appeared to be a continuing rule of this Court until today. Further, see *Ex parte Dunham*, 650 S.W.2d 825 (Tex.Cr.App.1983); *Burnett v. State*, 642 S.W.2d 765 (Tex.Cr.App.1983) (Dally, J., Dissenting opinion); *Ex parte Burns*, 601 S.W.2d 370, 372 (Tex.Cr.App.1980); *Ex parte Scott*, 581 S.W.2d 181 (Tex.Cr.App. 1979). Cf., however, *Ex parte Ybarra*, 629 S.W.2d 943 (Tex.Cr.App.1982); *Ex parte Diaz*, 610 S.W.2d 765 (Tex.Cr.App.1981); *Dugger v. State*, 543 S.W.2d 374 (Tex.Cr. App.1976).

However, when it came to retained counsel, cf. *post*, this Court early on held, in deciding whether counsel was ineffective,

that the question to be answered was whether counsel was guilty of willful misconduct without the knowledge of the client that amounted to a breach of a legal duty to the client that reduced the trial to a farce and a mockery of justice. *Boles v. State*, supra; *Ex parte Scott*, supra, at 182; *Gondek v. State*, supra; *Jones v. State*, 388 S.W.2d 429 (Tex.Cr.App.1965), whereas, as noted, when it came to court appointed counsel, the question was whether counsel rendered reasonably effective assistance. See *Ex parte Duffy*, supra, at 513–514.

## LABELS: ARE THEY MEANINGLESS UNTIL APPLIED?

As previously observed, courts, and now including the Supreme Court, have attempted to give labels in stating what standard of performance governs, as to whether counsel was ineffective, such as counsel's commissions or omissions caused the entire proceeding to result in "a farce and mockery of justice," counsel's lack of diligence or competence reduced the trial to "a farce or sham," counsel must be "reasonably likely to render reasonably effective assistance," and the like.

But, until applied, are these labels not too general or indefinite to distinguish the diligent from the indifferent attorney; acumen from incompetency?

## SOME THOUGHT PROVOKING QUESTIONS

Is it not true that until viewed in light of the circumstances of a particular case, general definitional standards are of little assistance in making the determination whether counsel was or was not effective counsel? It has been stated that "[b]ecause the cases do not present a unitary theory of the concept of a fair trial, standards for ineffective assistance have been merely extrapolated from the leading cases without any true theoretical link between the various types of misconduct discussed." Whitebread, *Constitutional Criminal Procedure*, at 365. When, exactly, does counsel's acts of commission or omission cause a trial to become "a farce

and mockery of justice?" If the record reflects that counsel filed a "ton" of written motions, was vigorous in his cross-examination of the State's witnesses, gave a full closing argument, and displayed a sagacious election of trial tactics, will he be deemed effective counsel, even when it is established that he did absolutely no pretrial investigation of the case? Never consulted with the client? Has not read a law book since he finished law school over ten years ago? Has not attended a criminal law institute since he finished law school over ten years ago? What if counsel is board certified in criminal law? Is he to be held to a higher standard than counsel who is not board certified?

Or, better yet, in their past efforts to place stringent requirements that must be satisfied before counsel will be held to be ineffective, have appellate courts placed before the defendant what oftentimes are insurmountable barriers in establishing that counsel was ineffective in an effort to protect trial judges? Lawyers, of course, should and must be willing to explain what they did and why they did it. But, what if an attorney cannot explain what facially is a blatant error of commission or omission? If he cannot explain it, how can a trial judge explain why he did not intervene?

## THE TEST IN TEXAS

In Texas, the test used for determining the effectiveness of counsel has been the reasonably effective assistance standard, i.e., counsel likely to render and rendering reasonably effective assistance. The test is applied by gauging the totality of the representation rendered, *Ex parte Duffy*, supra, also see *Caraway v. State*, 417 S.W.2d 159 (Tex.Cr.App.1967); *McKenna v. Ellis*, 280 F.2d 592 (5th Cir.1960), modified per curiam, 289 F.2d 928 (5th Cir.1960), cert. denied, 368 U.S. 877, 82 S.Ct. 121, 7 L.Ed.2d 78 (1961), which first announced the test, and the determination whether counsel was effective has always been decided by this Court on a case by case approach.

Although it may be true that the above test this Court has adopted was one origi-

nally announced by the Fifth Circuit in *McKenna v. Ellis*, supra, nevertheless, it is also axiomatic that this Court is not bound by rulings of lower federal courts on Federal Constitutional questions, because both state and federal courts are of parallel importance in deciding such questions, and both answer to the Supreme Court on direct review. *Pruett v. State*, 463 S.W.2d 191, 194 (Tex.Cr.App.1971). However, the same is not true when this Court interprets the State Constitution and State statutory provisions, because its interpretation of those laws is supreme.

Furthermore, but as pointed out by Clinton, J., and Wice, in their law review article entitled "Assistance of Counsel in Texas," 12 *St. Mary's Law Journal* 1, 7 (1980), although the Fifth Circuit did originally adopt the above test in *MacKenna v. Ellis*, supra, it did not continuously adhere to that test, whereas this Court has for the most part continuously adhered to the above test. Judge Clinton and Wice pointed out the following: "While the Fifth Circuit was struggling to explain its applicable standard of competency, the Court of Criminal Appeals was similarly engaged in settling its own ... Accordingly, the 'reasonably effective assistance' standard remains viable in ... the Court of Criminal Appeals."

## THE MAJORITY'S ASSERTION

The majority asserts that "With respect to determining ineffectiveness, the general standard established in Strickland differs little or not at all from this Court's standard ..." Using this statement as its linchpin, it is then able to conclude the following:

In short, [Texas] constitutional and statutory provisions do not create a standard in ineffective assistance cases that is *more* protective of a defendant's rights than the standard put forward by the Supreme Court in *Strickland.* Accordingly, we will follow in full the *Strickland* standards in determining effective assistance and prejudice resulting therefrom.

In light of what I have stated so far, I must totally disagree with the majority's conclusion.

## HAVE PROFESSOR GENEGO AND I READ A DIFFERENT STRICKLAND V. WASHINGTON?

Perhaps, however, Professor William J. Genego, see 22 *Am. Cr. L. Rev.* 182, "The Future of Effective Assistance of Counsel: Performance Standards and Competent Representation," and I have read a different *Strickland* opinion than the one the majority read because he draws this conclusion therefrom: "While adopting the new 'reasonable competency' language, the Strickland Court wrote the opinion in a manner which ensures that the courts will still apply the underlying elements of the 'farce and mockery' test." (181).

And yet, at least since *Caraway v. State*, supra, if not at least since *Ex parte Gallegos*, 511 S.W.2d 510 (Tex.Cr.App.1974), was decided, this Court has rejected the "farce and mockery test" in passing upon ineffective assistance of counsel claims.

Thus, if *Strickland*, supra, holds that, for Sixth Amendment purposes, courts must apply the underlying elements of the "farce and mockery" test, then why does the Supreme Court's standard not differ from this Court's standard of "reasonably effective assistance?"

## STRICKLAND V. WASHINGTON

On May 14, 1984, the Supreme Court, after deciding to venture for the first time in its history into the disorderly accumulation of metaphors, see supra, regarding what standard shall govern when it comes to deciding claims of ineffective assistance of counsel, decided *Strickland v. Washington*, supra. As pointed out by Professor Genego, see supra, the Supreme Court decided to try its hand at addressing the issue of what standard should govern for Sixth Amendment purposes. It did so only after all the federal circuit courts of appeals had adopted the "reasonably competent" standard.

In my view, the Supreme Court could not have selected a sorrier case to use as its

vehicle to write on such an important issue in federal criminal law.

The facts reflect that the defendant, Washington, during a ten-day period of time, planned and committed three groups of crimes, which included three brutal stabbing murders, torture, kidnapping, severe assaults, attempted murders, attempted extortion, and theft. The defendant confessed to the police about the third of the criminal episodes and also confessed to the first two murders. Acting against court-appointed counsel's advice, the defendant pled guilty to three counts of first degree murder, multiple counts of robbery, kidnapping for ransom, breaking and entering and assault, attempted murder, and conspiracy to commit robbery. Also acting against counsel's advice, the defendant waived his right under Florida law to an advisory jury at his capital sentencing hearing. In short, the defendant placed the decision whether he should live or die in the hands of a trial judge, who had "a great deal of respect for people who are willing to step forward and admit their responsibility." Although the opinion states that court appointed counsel was "an experienced criminal lawyer," it does not reflect what, if any, knowledge or experience counsel had with this particular judge regarding his views on punishment and his assessing punishment in different kinds of criminal cases, i.e., the record does not reflect whether the trial judge was "hard-nosed" or "liberal" when it came to assessing punishment, and what he had previously done in a case comparable to this one.

In the trial court, after argument by counsel, and after the trial judge found numerous aggravating circumstances, (and none or a single comparatively insignificant mitigating circumstance, which was apparently the fact that there was no evidence of any prior convictions, and not the fact that the defendant had been willing to step forward and admit his responsibility), he sentenced the defendant to death on each of three counts of capital murder and to prison terms for the other crimes.

## WASHINGTON'S ATTACK ON HIS TRIAL COUNSEL COMMENCES AND THE CASE REACHES THE ELEVENTH CIRCUIT COURT OF APPEALS

By way of post-conviction collateral attack on the death sentences that were imposed, it was claimed that trial counsel was ineffective in six respects. None concerned the defendant's pleas of guilty. On eventual appeal to the Eleventh Circuit, see *Washington v. Strickland*, 693 F.2d 1243 (11th Cir.1982), the claims were narrowed to the following: (1) whether counsel was ineffective because he failed to investigate, procure, and present character evidence relevant to the sentencing stage of the trial, and (2) whether this failure prejudiced the defendant in the conduct of his defense to the imposition of the death sentence. The Eleventh Circuit ordered the cause remanded to the lower court for a hearing. If the lower court found that "there was more than one plausible line of defense at the expense of another; and if the strategic choice was reasonable, Tunkey (the attorney) did not breach his duty to investigate." (at p. 1258). Tunkey had testified that he made a strategic choice to introduce limited character evidence during the plea colloquy and thereafter to rely upon expressions of frankness, sincerity, and remorse to persuade the judge to impose a sentence of life imprisonment. (at p. 1251). The Eleventh Circuit held: "In sum, an attorney who makes a strategic choice to channel his investigation into fewer than all plausible lines of defense is effective so long as the assumptions upon which he bases his strategy are reasonable and his choices on the basis of those assumptions are reasonable." (At p. 1256). The Eleventh Circuit also held that if the defendant established that Tunkey was ineffective counsel, then the lower court should make the determination whether the defendant suffered prejudice of sufficient magnitude to warrant granting the writ of habeas corpus, i.e., the defendant had to show not only "a possibility of prejudice, but that [it] worked to his actual and substantial disadvantage." If the defendant was successful in satisfying his burden, then the lower

court was ordered to make the determination whether the prosecution established that the error was harmless beyond a reasonable doubt. In making its holdings, the Eleventh Circuit acknowledged that the Sixth Amendment accorded criminal defendants the right to assistance of counsel, and also held that a vital corollary to this right is that counsel is reasonably likely to render and renders reasonable effective assistance given the totality of the circumstances. (At p. 1250).

## WHAT IS LACKING IN STRICKLAND V. WASHINGTON

I believe that the most important thing lacking in *Strickland v. Washington,* supra, is the fact that the question whether trial counsel was ineffective did not concern the merits of the case itself, either as to pretrial or trial. The Supreme Court concerned itself only with what would be in this State the equivalent of a "capital murder punishment hearing," that was held, not before a jury, but before a trial judge, and its discussion concerned only counsel's failure to prepare for the punishment hearing.

As previously noted, no trial, as that term is ordinarily understood by members of the legal community, occurred in *Strickland v. Washington,* supra, because the defendant pled guilty to the charges. Thus, Washington did not dispute what the State of Florida had accused him of committing. The only issue that was then before the trial judge was what punishment should be assessed.

## WHAT LEGAL DEFENSE IS THERE TO THE ASSESSMENT OF PUNISHMENT?

The Supreme Court considered the assessment of punishment as though there is a legal defense to the imposition or assessment of punishment after a defendant has been found guilty. However, I am unaware, except possibly where the defendant becomes insane after he is found guilty, or where there is some legal reason to prevent the assessment of punishment, that a defendant has a legal defense to the assessment of punishment in a criminal case.

## TEXAS LAW AND FLORIDA LAW ARE NOT THE SAME

The Supreme Court also overlooked the fact that not all of our States have the same procedure when it comes to assessing punishment where the defendant has been found guilty of a crime for which the death penalty is a possible punishment.

For example, the procedure which governs a capital murder punishment hearing in Texas, see Art. 37.071, V.A.C.C.P., is a far cry from the procedure mandated by the State of Florida. Another major difference between Texas and Florida law is that because of Articles 1.13 and 1.14, V.A.C.C.P., both the State and the defendant are precluded from waiving trial by jury on the issue of guilt *or* punishment where the accusation is capital murder. *Ex parte Bailey,* 626 S.W.2d 741 (Tex.Cr.App.1981); *Ex parte Jackson,* 606 S.W.2d 934 (Tex.Cr.App.1980); *Eads v. State,* 598 S.W.2d 304 (Tex.Cr.App.1980); *Ex parte Dowden,* 580 S.W.2d 364 (Tex.Cr.App.1979); *Batten v. State,* 533 S.W.2d 788 (Tex.Cr.App.1976). Cf. *Hicks v. State,* 664 S.W.2d 329 (Tex.Cr.App.1984). Furthermore, under Texas law, there is no such thing as a presentence investigation report when *the jury* assesses punishment, whether the case is capital or non-capital. Lastly, but because Texas case law contains so many dangers and disadvantages to putting on any evidence at the punishment hearing after the defendant has been found guilty of capital murder, I believe that almost every defense attorney in this State who has defended a person convicted of capital murder, or even a non-capital murder case, will attest that to do so can be extremely risky and dangerous business for his client because of the doctrine of curative admissibility and waiver of error to errors that occurred at the guilt stage of the trial, as well as the danger of aggravating what was already a bad situation. See *Smyth v. State,* 634 S.W.2d 721, 724 (Tex.Cr.App.1982) (Teague, J., dissenting opinion).

Records of capital murder cases in this Court's archives also reflect that it is the rare capital murder case where the defendant, who has been found guilty of capital murder, presented any evidence at the punishment hearing.

This, of course, is not to say that the defense attorney in a capital murder case should not consider putting on evidence at the punishment hearing; it is simply to say that if he does he runs many risks that might very well aggravate the situation, which can be costly and even deathly to his client.

## WHAT WAS LAWYER TUNKEY'S ERROR?

The opinion in *Strickland v. Washington,* supra, reflects that the only serious omission by Tunkey, Washington's trial attorney, was his failure to investigate and find the fourteen friends, former employers, neighbors, and relatives who later attested that they would have testified at Washington's punishment hearing if they had been asked to do so. However, the majority opinion points out that these persons would have only testified that the defendant was "basically a good person who was worried about his family's financial problems," or, as Justice Marshall put it in his dissenting opinion, in the witnesses' experiences with the defendant, the defendant "was a responsible, nonviolent man, devoted to his family, and active in the affairs of his church."

I sincerely believe that even the most unskilled and unlearned capital murder prosecutor in Texas would have had a field day with these witnesses during his cross examination of them, if the case had been tried in Texas and the witnesses had gotten up in the face of what the defendant Washington had done and testified as set out above.

## THE SUPREME COURT'S TESTS FOR INEFFECTIVE COUNSEL

In deciding whether counsel is ineffective, the Supreme Court held that before counsel can be deemed ineffective, the following question must be answered in the affirmative: "[Did] counsel's conduct so undermine the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result?" In *Strickland v. Washington,* supra, in place of the word "trial," the Supreme Court substituted the phrase, "a capital sentencing proceeding." Is this, however, not the "farce and mockery" test that this Court has refused to adopt, and so long ago abandoned?

The Supreme Court then enunciated a three-part test to determine whether counsel's conduct was ineffective under the Sixth Amendment. *The first part of the test* requires that the defendant must first identify the acts or omissions he claims rendered counsel ineffective. However, he is confronted at the outset with "strong" presumptions that counsel fulfilled his role in the adversary process that the Sixth Amendment envisions and "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment," i.e., that he acted reasonable under prevailing professional norms. The acts or omissions must not be subject to reasonable professional judgment. The defendant *must next* establish by a preponderance of the evidence that (1) counsel's performance was deficient, i.e., that counsel's performance fell below an objective standard of reasonableness, and that he made errors so serious that counsel did not function as the "counsel" guaranteed the defendant by the Sixth Amendment, and (2) that the deficient performance prejudiced the defense, i.e., that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is presumed to be reliable. "Unless a defendant makes [these] showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable ... The proper measure of attorney performance remains simply reasonableness under prevailing professional norms. The Court also held: "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assist-

ance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' "

If the defendant hurdles the above presumptions, he still has the burden to establish that the error of commission or omission had an effect on the judgment of conviction or sentence. The defendant must "affirmatively prove prejudice," i.e., that the error or errors "had an adverse effect on the defense." In this regard, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." A reasonable probability was defined by the Court to mean "a probability sufficient to undermine confidence in the outcome," i.e., "[W]hether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt (or that the factfinder would not have assessed the death penalty)." Or, to put it another way, "the decision reached would reasonably likely have been different absent the errors."

However, the defendant runs into another presumption when it comes to establishing prejudice or that the error or errors had an adverse effect on the judgment of conviction or sentence. It is also presumed that "absent challenge to the judgment on grounds of evidentiary insufficiency, the judge or jury [is presumed to have] acted according to law ... The assessment of prejudice should proceed on the assumption that the decisionmaker reasonably, conscientiously, and impartially applied the standards that govern the decision."

## TUNKEY WAS NOT INEFFECTIVE COUNSEL

In *Strickland v. Washington*, supra, for reasons stated in the opinion, many of which I have also set out herein, the defendant Washington did not even get out of the chute in his claim that Tunkey, his trial counsel, was ineffective and the sentencing proceeding was fundamentally unfair. The Supreme Court denied him any relief.

## THE LACK OF UNDERSTANDING BY THE SUPREME COURT OF THE ROLE OF THE CRIMINAL DEFENSE ATTORNEY

There is, of course, much mischief that will flow from *Strickland v. Washington*, supra. Probably its greatest piece of mischief lies in the Supreme Court's lack of understanding, for whatever reasons, of the role that the criminal defense attorney plays in our society. "The role of an attorney for a defendant facing criminal prosecution (or sentencing) is not, however, to see that his or her client received a fair trial and that a just outcome resulted. The attorney's role is to do everything ethically proper to see that the client receives the most favorable outcome possible—whether or not it produces an outcome which society considers just. Society relies on the adversary system to produce just results from partisan advocacy. The guiding principle in determining whether an attorney has provided effective representation must then be whether he or she discharged the role of partisan advocate faithfully and zealously, not whether the performance yielded what a court views as a just result." Genego, supra, at 200.

## ANOTHER PREDICTION

For those defendants, especially those who are indigent, the promise guaranteed by the Sixth Amendment, that counsel will be effective, I predict will remain a promise unfulfilled. For those who are now to be subject to what the Supreme Court stated in *Strickland v. Washington*, supra, in making ineffective assistance claims, they will be confronted with the procedural textbook the Supreme Court has given lower courts in how to dispose of their claims, namely, "apply a strong presumption of competency to everything a lawyer does, a heavy measure of deference to strategic decisions and an uncritical assumption of the reliability of the result of the original proceeding." Genego, supra, at 201. For these reasons, if no other, a convicted defendant clearly denied effective assistance of counsel at his trial will find it extremely difficult, if not impossible, to obtain relief.

See, for example, *Larsen v. Maggio,* 736 F.2d 215 (5th Cir.1984), in which the Fifth Circuit held that "where the defendant fails to demonstrate prejudice, the alleged deficiencies in counsel's performance need not even be considered," (at p. 217); also see *Ricalday v. Procunier,* 736 F.2d 203 (5th Cir.1984); *Gomez v. McKaskle,* 734 F.2d 1107 (5th Cir.1984).

In light of what the Supreme Court has stated in *Strickland v. Washington,* supra, I believe its decision places too heavy a burden upon a convicted defendant who claims that his trial counsel was ineffective. This Court should, therefore, hold that Art. 1, Section 10, of the Texas Constitution and Art. 1.05, V.A.C.C.P., apply higher standards to appointed or retained counsel, than those enumerated in *Strickland.* Because it fails to do so, I must respectfully dissent.

## UNITED STATES V. CRONIC

The majority opinion fails to cite or discuss the companion case to *Strickland,* namely, *United States v. Cronic,* 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), which reversed the Tenth Circuit Court of Appeals decision of *Cronic v. United States,* 675 F.2d 1126 (10th Cir.1982), which had held that inadequacy of representation may be inferred without proof of specific prejudice at trial, from the following factors: (1) the time afforded for investigation and preparation; (2) the experience of counsel; (3) the gravity of the charge; (4) the complexity of possible defenses; (5) the accessibility of possible witnesses to counsel, and ordered the defendant's conviction reversed where it was established that the defendant's attorney, whose prior experience in federal criminal practice was limited to "involvement" in one other case, but that this was his first "trial," and his practice was limited to real estate law; that it took the Government four-and-one half years to prepare the charge, for which the defendant faced a sentence of up to sixty-five years, but the attorney was afforded only 25 days in which to prepare for trial. Counsel put on no defense. The trial lasted four days. The defendant received a twenty-five year sentence. The Supreme Court, however, made short shrift of the decision of the Circuit Court of Appeals, by first holding that "only when surrounding circumstances justify a presumption of ineffectiveness can a Sixth Amendment claim be sufficient without inquiry into counsel's actual performance at trial." Because it was not demonstrated that counsel had failed to function "in any meaningful sense as the Government's adversary," and in light of the presumptions stated in *Strickland v. Washington,* supra, the Supreme Court reversed. However, it told the defendant, "Respondent can therefore make out a claim of ineffective assistance of counsel by pointing to specific errors made by trial counsel ... Should respondent pursue claims based on specified errors made by counsel on remand, they should be evaluated under the standards enunciated in *Strickland v. Washington,* supra."

I believe that the defendant Cronic will find that in light of *Strickland v. Washington,* supra, from a legal standpoint, the Federal courthouse door will not only be closed when he gets there, it will be locked tighter than you know what.

## MY PROPOSED STANDARD

I believe that the right to counsel is empty unless counsel, whether he be retained or court appointed, adequately and effectively represents his client, the accused. I believe that the proper standard for judging counsel's effectiveness is the standard of the adequacy of legal services as in any other profession; the exercise of the customary skill and knowledge which normally prevails in the field of criminal law at the time and place where the services are rendered. E.g., *Moore v. United States,* 432 F.2d 730 (3rd Cir.1970, at 736. I find that such a standard is commendable, and would be acceptable to the members of the bar who practice criminal law in this State and defend persons accused of committing criminal wrongs. This standard, of course, seeks to exact the highest possible level of assistance for the accused. But what is wrong with that? What is wrong with trying to achieve the highest possible legal representation for accused

persons? What is wrong with trying to upgrade the criminal defense bar? None other than Hon. Warren Burger, recently the Chief Justice of the Supreme Court, has been the leading critic of trial lawyers of these United States. He maintains that large numbers of the trial bars of our States are unqualified and incompetent to try cases, "Ten years ago I suggested that up to one-third or one-half of the lawyers coming into our courts were not really qualified to render fully adequate representation ..." See Burger, "The State of Justice," 62 *American Bar Association Journal* 62, 64, in which he points out that he might have been too high; the correct figure being 25 or 30 percentum. Also see Burger, "The Special Skills of Advocacy: Are Specialized Training and Certification of Advocates Essential to Our System of Justice?", 42 *Fordham L.Rev.* 229 (1973). Chief Justice Burger also maintains that "the behavior of some of the more visible advocates is not such as to reflect credit on our profession." Burger, "The State of Justice," *op. cit.* He, of course, does not believe that trial lawyers should represent their clients to the fullest extent allowed by law: "Historically, honorable lawyers complied with traditions of the bar and refrained from doing all that the law or the Constitution allowed them to do." But, for one who believes that there is such a large number of incompetent members of our trial bars in these United States, isn't it rather strange that the former Chief Justice did not dissent in *Strickland v. Washington*, supra. Perhaps, however, it is easier to hold the trial bar up to public ridicule and contempt with references to such as "procurers," "hired guns," and "hucksters," as he has been known to do in the past, see Shrager, "Response to Chief Justice Burger: President's Page," 20 *Trial*, No. 4, April, 1984, than it is to mandate that members of the trial bar be more accountable for their actions and omissions.

Of course, former Chief Justice Burger is the justice who once stated that an attorney who voiced the contention that the "absence of counsel at the police lineup voids a conviction" was acting in a bizarre and "Disneyland" fashion. He has also implied that any unusual suggestion that an indigent client might make as to how to defend his case is "absurd and nonsensical," and for the attorney to execute any suggestion by the client that might be considered "bizarre" causes the attorney to "stultify himself or prostitute his professional standards." *Williams v. United States*, 345 F.2d 733, 736 (D.C.App.1965) (Burger, C.J., concurring).

Under my proposed standard, the defendant, of course, would have to establish a prima facie case of ineffective assistance of counsel by showing that specified acts of commission or omission by the attorney would be considered erroneous by the average criminal lawyer. Once this has been accomplished the State would then have the burden of proving that either no actual prejudice resulted from the attorney's ineffectiveness, or that such was harmless error.

For the above reasons, I respectfully concur in the result but dissent to the majority's taking the wrongful step of locking the courthouse doors to those persons who seek relief because they have been deprived of the effective assistance of counsel at their trials.