11th
Court of Appeals

                                                                  Eastland,
Texas

                                                                        Opinion

 

Paul Pitts

Appellant

Vs.                   No.
11-02-00247-CR -- Appeal from Dallas County

State of Texas

Appellee

 

The jury
found that Paul Pitts was guilty of a felony offense (burglary of a
habitation), found that 2 enhancement allegations were “true,” and then
assessed his punishment at confinement for 35 years.  We affirm.

                                                                   The
Indictment

The
indictment charged that, on or about October 23, 2001, appellant unlawfully
entered the habitation of Vicky West without her consent and with the intent to
commit an assault.[1]

                                                                   Points
of Error

Appellant
presents two points of error.  First, he
argues that the trial court erred in allowing “prejudicial extraneous evidence.”  This point refers to proof that West had
secured a protective order which prohibited appellant from going within 500
feet of her residence or place of employment.  
Appellant argues in his other point of error that he was “denied
effective assistance of counsel” in violation of U.S. CONST. amend. VI and in
violation of TEX. CONST. art. I, ' 10.

                                                                    The
Evidence








There was
no challenge to the sufficiency of the evidence.  The State=s first witness, Officer Greg Fregeau of the Dallas Police Department,
testified that he was sent by the dispatcher to a location in South Oak Cliff
on October 23, 2001, at 2:17 a.m. for “a disturbance with known male refusing
to leave the location.”  Officer Fregeau
said that the front door of the home had been forced open.  Relevant portions of Officer Fregeau=s testimony on direct examination by the
prosecutor read as shown:

Q:
Okay.  Can you describe to the jury,
what did [West] look like?

 

A: She
looked like she had been in some kind of struggle.

 

                                                           *    *   
*

 

Q: The
injuries that you saw on her, you said you noticed some obvious scratches on
her neck?

 

A: She had
a fresh scratch....There was blood on it. 
On the left side of her neck.  On
the left upper chest [and] behind her right ear.  And she also had some braids in her hand that had been pulled
out of her head.

 

                                                           *    *   
*

 

Q: And
while she was under that stress or excitement, what did she tell you had
happened. [The objection to “hearsay” was overruled.]

 

A: She
told me that she received a phone call from [appellant].  And he wanted to know whose car was in her
driveway, and, you know, she said she didn=t want to talk to him [and] shortly after that [appellant] was banging
on the front door.   (Emphasis added)

 

Officer
Fregeau identified the photographs which he took that night, and they show the
injuries which West received.  During
his cross-examination, Officer Fregeau said that West  declined his offer to call an ambulance and that she was the only
person he interviewed at the scene. 
Appellant left before the officer arrived, and the only other person who
was there was a four-year-old boy. 
Officer Fregeau said that West told him that appellant was the father of
her son and that appellant had never lived with them in that town home.








The State
called only one other witness before resting.  
West testified that she was 26 years old at the time of trial and that
her son was four years old.  West
testified that she worked for the federal government and that she had a second
job with Fidelity Investment Company. 
West testified that she and appellant “started dating” in June or July
of 1996.  West said that appellant was
abusive, that she had broken up with him “many times,” and that she and her son
were the only ones living in her town home on October 23, 2001.  Relevant portions of her testimony in answer
to questions by the prosecutor read as shown:

Q: Did he
say anything to you the next time he called you?

 

A:
Yes.  He asked me to stop hanging up,
that he wanted to talk to me.  He wanted
to see me.  And I told him I didn=t want to see him.  And he said, well, you must have someone over.  And I told him that I do not have anybody
over, that it=s late, that I did not feel like being
bothered, you know, and I would talk to him some other time.  So - -

 

Q: So what
happened after that?

 

A:
Okay.  Then I hung up on him again.  He calls back again and he asked me, don=t hang up. 
And I hung up anyway.  So after a
hour or so had passed...I heard a bam, bam, bam, bam, bam, bam.  So I jump up out the bed.  It frightened me.  And I went to the door and it was [appellant].

 

Q: How did
you know it was him?

 

A: I
looked out the peephole, and he...was outside cursing....So I told him, I said
if he did not leave, I was going to call the police.  

 

                                                            *    *   *

 

Q: And
then what happened?

 

A:
Okay.  I was...waiting for the police,
hoping that the police [would get] there in time so I wouldn=t have to do anything.  And my son was upstairs screaming.  I didn=t know what to do.  I was just
shaking.

 

So then he
kicks in the door. [I pointed my gun at him but] it didn=t go off. 
So he just immediately grabbed me and pinned me down.  And I was up against the couch.  And he was hitting me, just hitting me.

 








West said
that appellant left after he made sure that no one else was there, that the
police officer arrived about five minutes later, that her door was messed up,
and that she called the  maintenance man
to board up the door.  West said that
the police officer took pictures of her and made sure that she had a safe place
to stay that night.  West said that she
had to wear a wig while her hair grew back. 
She identified the braids of hair which appellant pulled out of her head
that night, and they were admitted into evidence.  West testified that appellant did not have her permission to come
to her home that night and that he had never lived at that location.  West also testified that she was given an
eviction notice because there was a “zero tolerance” policy at the place where
she and her son had been living.  During
her cross-examination, West said that she had never lived with appellant.  West admitted that she pointed her gun at
appellant and pulled the trigger, but she said that she aimed low because she
did not want to hurt him.

There was
a discussion in open court, outside the presence of the jury, concerning the
admissibility of testimony about the protective order which West secured on
April 16, 2001, prohibiting  appellant
from going within 500 feet of her residence or place of employment.  The trial court overruled the objection
under TEX.R.EVID. 404(b), finding that this evidence was relevant on appellant=s “intent.” 
The trial court also announced that, under TEX.R.EVID. 403, it did not
find that the probative value of this testimony was substantially outweighed by
the danger of unfair prejudice.  After
the jury returned to the courtroom, the reporter=s record shows West=s answers to the following questions by the prosecutor:

Q: [A]t
some point did you get a protective order?

 

A: Yes.

 

                                                           *    *   
*

 

Q:
Okay.  And is this a protective order
involving Vicky West and [appellant].

 

A: Yes.

 

[DEFENSE
COUNSEL]: Your Honor, same objection.

 

THE COURT:
I=ll sustain the objection.  Let=s not go into the content of the document
without getting it admitted into evidence.

 

                                                            *    *  
*

 

[PROSECUTOR]:
Your Honor, at this time I=d offer...the protective order.

 








[DEFENSE COUNSEL]: Object
to improper predicate, hearsay and best evidence.

 

THE COURT: Sustained as
to the predicate.

 

                                               *    *   
*

 

Q: [W]ith respect to
Cause No. 99CV-990143 - -

 

[DEFENSE COUNSEL]:
Objection, Your Honor.

 

THE COURT: I=ll sustain the objection.  That=s reading from a document not yet admitted into evidence.

 

Q: Were you at a
protective order hearing on April 16th, 2001?

 

[DEFENSE COUNSEL]: Your
Honor, asked and answered.

 

THE COURT: Sustained.

 

A: Yes.

 

[PROSECUTOR]: I=ll pass the witness.  (Emphasis added)

 

The State
rested, and two witnesses testified for appellant.  Appellant=s mother, Virginia Twilly Pinker, testified that appellant and West
were “living together” at the “town home,” that appellant would open the gate
with a code in order to get to their town home, and that appellant drove West=s car “all the time.”   On cross-examination, appellant=s mother agreed that West came to see her
after the incident and that West said that appellant had “kicked in the door”
and “put his hands on her.”  

Appellant=s brother, Joe Freddy Pitts, Jr.,  testified that he had known West for about
five years, that she was his brother=s ex-girlfriend, and that she was the mother of his brother=s son. 
This witness testified that appellant was living with West and their son
in the town home where the incident occurred, that he had visited his brother
at that town home, that his brother had the code to open the gate, and that his
brother had a key to the town home.  








After the
two defense witnesses testified, the State called one rebuttal witness.  Carol Hinton testified that she is a
property manager for Columbia Luxar Townhomes. 
Hinton authenticated the lease which showed that only West and her son
were shown as occupants of the town home. 
Hinton also said that it was the policy of the town homes that “every
one that lives in the unit is supposed to be on the lease.”  Hinton said that she had never had any
problems with West but that West=s lease was terminated on the day that appellant broke into her town
home because of the “zero tolerance” policy. 

                                                   Evidence
about the Protective Order

The
protective order was not introduced into evidence during the guilt/innocence
portion of the trial, but West was permitted to testify that she had gotten a
protective order “involving” appellant.[2]  The trial court did not err in permitting
this testimony.  It was relevant under
Rule 404(b) to show appellant=s intent when he broke into the town home and to show his knowledge of
the fact that he was not supposed to be there. 
See, e.g., Montgomery v. State, 810 S.W.2d 372, 391 (Tex.Cr.App.1991).  Trial courts are given “great discretion” in
their evidentiary rulings, and appellant has not shown an abuse of that
discretion.  Pena v. State, 102 S.W.3d
450, 453 (Tex.App. - Eastland 2003, no pet=n).  The first point of error is
overruled.

                                                       Effective
Assistance of Counsel








In
discussing an accused defendant=s right to effective assistance of counsel under U.S. CONST. amend. VI
and TEX. CONST. art. I, ' 10, the court said in Hernandez v. State, 726 S.W.2d 53, 57
(Tex.Cr.App.1986), that Texas “will follow in full” the standards which were
established in Strickland v. Washington, 466 U.S. 668 (1984), ”for determining
ineffectiveness of counsel and for ascertaining when such ineffectiveness is
prejudicial.”  The court quoted those
standards in Hernandez v. State, supra at 55:

[T]he proper standard for attorney
performance is that of reasonably effective assistance....When a
convicted defendant complains of the ineffectiveness of counsel=s assistance, the defendant must show that
counsel=s representation fell below an objective standard
of reasonableness....A convicted defendant making a claim of ineffective
assistance must identify the acts or omissions of counsel that are alleged not
to have been the result of reasonable professional judgment.  The court must then determine whether, in
light of all the circumstances, the identified acts or omissions were outside
the wide range of professionally competent assistance....The court should
recognize that counsel is strongly presumed to have rendered adequate
assistance and [to have] made all significant decisions in the exercise of
reasonable professional judgment.

 

                                                            *    *  
*

 

The defendant must [also] show that there is
a reasonable probability that, but for counsel=s unprofessional errors, the result of the
proceeding would have been different.  (Emphasis added)

 

See also and compare
Tompkins v. State, 869 S.W.2d 637, 641 (Tex.App. - Eastland), pet=n dism=d, 888 S.W.2d 825 (Tex.Cr.App.1994).

Appellant
has not shown ineffective assistance of counsel, nor has he shown “a reasonable
probability” that the result of his trial would have been different if his
trial counsel had attempted to present testimony that he was acting in “self-defense”
(the act or omission alleged in appellant=s brief).  Appellant=s trial counsel had a difficult case.  Appellant had assaulted his ex-girlfriend
after breaking into her town home. 
Appellant had actually pulled 
braids of hair out of her head. 
The second point of error is overruled.     

                                                                This
Court=s Ruling

The
judgment of the trial court is affirmed.         

 

BOB
DICKENSON

SENIOR
JUSTICE

July 31, 2003

Do not publish.  See TEX.R.APP.P. 47.2(b).

Panel consists of: Arnot, C.J., and

McCall, J., and Dickenson, S.J.[3]
          











[1]The enhancement paragraphs alleged that appellant was
convicted in 1992 for unauthorized use of a motor vehicle and that he was
convicted in 1990 for burglary of a building.





[2]During the punishment phase of trial, West testified
that her relationship with appellant had been Avery
abusive.@  West said that
appellant had been verbally and physically abusive, and she described the prior
assaults which had caused her to secure 
protective orders on August 24, 1999, and again on April 16, 2001. 

 

 In December of 1996, while West was pregnant
with their child,  appellant burned her
on the face, chest, and arm with an iron while she was ironing.  West showed the scars to the jury and said
that she had second degree burns from that incident. West also discussed an
incident in November of 1998 when appellant jerked her out of a car and slammed
her  on the grass; she said that she had
a knot on her head and that one of her fingernails was ripped off.  West also told the jury about an incident in
December of 1998 when appellant came to her home, pushed her down, choked her,
and pulled her telephone cord out so that she could not call the police.  West also told the jury about an incident in
August of 1999 when appellant grabbed her and the baby.  Appellant started pulling them toward the
bedroom, and she jumped over the balcony to get away from him.  West said that she was Avery scared@ of
appellant and that he had said that he would kill her if she caused him to
spend any more time in jail or if she took his son away from him.    





[3]Bob Dickenson, Retired Justice, Court of Appeals, 11th
District of Texas at Eastland sitting by assignment.