

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

No. AP-75,704

EX PARTE DENNIS WAYNE ARD, Applicant

ON APPLICATION FOR A WRIT OF HABEAS CORPUS
CAUSE NO. W01-43277-N(A) IN THE 195TH DISTRICT COURT
OF DALLAS COUNTY

*Per curiam.*

In this post-conviction application for a writ of habeas corpus, brought pursuant to Article 11.07 of the Code of Criminal Procedure, the applicant claims that his counsel rendered ineffective assistance at both the guilt and the punishment phases of his trial. The convicting court's findings of fact and conclusions of law support its recommendation to grant the applicant relief. We grant relief.

The applicant was convicted of aggravated sexual assault of a child and sentenced to sixty years in prison. He appealed, and some of his points of error were based on ineffective assistance of counsel. The Fifth Court of Appeals affirmed the trial court's judgment.[1]

In his habeas application, the applicant brings twelve claims that his trial counsel rendered ineffective assistance. We find that trial counsel's performance was deficient in at least one instance which had not, and could not have, been raised on appeal:[2] that, during the guilt phase of the trial, counsel failed to adequately prepare and present expert testimony concerning memory implantation.

We requested briefing by the parties on the issue of whether the applicant was prejudiced by this performance.

On a claim of ineffective assistance of counsel brought in a habeas application, we apply the standard articulated in *Strickland v. Washington*[3] and adopted by this court in *Hernandez v. State*.[4] We judge ineffective assistance according to "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."[5] To obtain relief, the applicant must show first that counsel's performance was deficient.[6] Deficiency is shown when counsel's performance falls below an

---

[1] *Ard v. State*, No. 05-02-01915-CR, 2004 WL 1813753 (Tex. App.—Dallas Aug. 16, 2004) (not designated for publication).

[2] See *Ex parte Torres*, 943 S.W.2d 469 (Tex. Cr. App. 1997).

[3] 466 U.S. 668 (1984).

[4] 726 S.W.2d 53 (Tex. Cr. App. 1986).

[5] *Strickland*, 466 U.S., at 686.

[6] *Id.*, at 687.

objective standard of reasonableness.[7] Second, the applicant must prove that this deficient performance prejudiced his defense at trial.[8] Prejudice is evaluated by whether there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."[9]

In a recent decision, we explained that, although the trial judge in a habeas corpus proceeding is the "original factfinder," it has been a longstanding principle of our writ jurisprudence that this court is the ultimate factfinder on habeas.[10] Because the trial judge is best situated to evaluate the credibility and demeanor of witnesses, we ordinarily defer to the trial judge's findings of fact and conclusions of law, when they are supported by the record.[11] If the habeas judge's findings of fact are supported by the record, this court typically accepts them as correct.[12] On the other hand, we will not defer to findings and conclusions that are not supported by the record, and in those cases, "we may exercise our authority to make contrary or alternative findings and conclusions."[13]

We address the applicant's contention that his counsel was ineffective at the guilt phase of his trial by failing to adequately present expert testimony on memory implantation.

---

[7] *Id.*, at 688; *Ex parte Amezquita*, 223 S.W.3d 363, 366 (Tex. Cr. App. 2006).

[8] *Strickland*, 466 U.S., at 687; *Ex parte Gonzales*, 204 S.W.3d 391, 393 (Tex. Cr. App. 2006).

[9] *Strickland*, 466 U.S., at 694.

[10] *Ex parte Reed*, 271 S.W.3d 698, 727 (Tex. Cr. App. 2008).

[11] *Ibid.*

[12] *Amezquita*, 223 S.W.3d, at 367; *Ex parte Mowbray*, 943 S.W.2d 461, 465 (Tex. Cr. App. 1996).

[13] *Reed*, 271 S.W.3d, at 727.

The complainant, B.C., was eight years old at the time of the offense. He testified at trial that, while spending the night at the home of his aunt and the applicant (her husband), the applicant forced him to engage in oral sex. It took several months for B.C. to make an initial outcry, and the applicant claims that, during this time, B.C. continually denied having been sexually abused. He made the accusations, the applicant argues, only after months of suggestive, leading, and harassing questioning by his parents, police, and therapists.

The applicant's defensive theory at trial was that B.C.'s accusations were a result of suggestion and coaching which tainted B.C.'s memory. In this writ application, the applicant claims that his trial counsel did not adequately present expert testimony regarding the scientific basis for memory implantation, which might very well have convinced the jury that B.C.'s version of the events was unreliable.

After conducting evidentiary hearings on the writ application, the habeas court made findings of fact and conclusions of law. In these findings, the trial court found the witnesses' testimony to be credible and to have supported a conclusion that trial counsel was ineffective. The findings regarding ineffective assistance at the guilt phase are as follows:

> The court finds that Appellant's trial attorney made the following error in the course of the guilt-innocence phase:
> He failed to challenge the competency and credibility of the alleged victim, the lone witness testifying that a sexual assault had occurred, based on the scientific theory of memory implantation. Though Dr. Michael Gottlieb, an expert on the subject, was ready and able to explain how false memory may be implanted by repetitious suggestion, trial counsel failed to adequately elicit testimony from the doctor that the theory is the subject of many treatises and is widely accepted by the scientific community, to explain how and why it can occur, and to enumerate those facts which, in his opinion, made the testimony of the alleged victim in the case suspect and unreliable. This failure on the attorney's part fell below any objective standard of reasonableness, and there is a reasonable probability that, but for it, the result of the trial would have been different. This court finds that the inadequate

presentation of such evidence, crucial to Applicant's defense, was, under the standard of *Strickland v. Washington*, 466 U.S. 668 (1984), ineffective assistance of counsel. Considering the deficiencies in the presentation of Dr. Gottlieb's testimony, based on a comparison of his trial testimony and his writ hearing testimony, it is the opinion of this court that there can be no confidence in the outcome of the trial.

***

This court, in conclusion, finds that, but for the ineffective assistance of counsel in both the guilt-innocence and punishment phases of the trial, there is a reasonable probability that a different outcome would have occurred; that, at the very least, there can be no confidence in the outcome.

We find that the record supports the court's findings.

The bulk of Dr. Gottlieb's trial testimony was focused on summarizing concepts surrounding the psychology of memory. He first gave an overview of four general concepts: 1) memory is generally fairly accurate, but it is not nearly as accurate as people believe; 2) memory degrades over time; 3) children's memory is not as developed as that of adults and is subject to certain challenges; and 4) memory is constructive, that is, it can change over time based upon subsequent experiences. He also explained the concept of suggestion and its effect on memory, as well as the fact that children are more susceptible to suggestion. Dr. Gottlieb then reviewed five particular challenges to children's memory: 1) "source monitoring," or difficulty remembering from where and from whom information was acquired; 2) "social-demand characteristics," or pressure that adults may unwittingly place on a child to give them a particular answer; 3) repetition, that is, the more a given subject comes up, the greater the potential to alter a child's memory; 4) emotional disturbance; and 5) the potential influence of counseling or psychotherapy. He testified that authority figures can be sources of challenge to a child's memory, and he acknowledged that therapists are authority figures. He discussed the ethical concerns when a child therapist takes on the dual role of investigator, as well as the proper protocol for conducting

a forensic interview of a child in cases of alleged sexual abuse. Dr. Gottlieb referred to B.C.'s case in particular only once, when trial counsel asked him, "[I]s [B.C.] the kind of person … that's in a category of persons that's subject to manipulation by suggestion or coaching or some other external factors, commonly?" Dr. Gottlieb replied, "By virtue of being a child, yes."

In his writ-hearing testimony, Dr. Gottlieb covered all of these topics, only in far greater detail. He also offered and summarized scholarly articles and scientific studies that substantiated the testimony. And he discussed therapy and the therapist's role at length, particularly in the context of child-sexual-abuse cases, including the potential for a therapist's preconceived notions to result in leading questions that can taint a child's memory. A significant portion of Dr. Gottlieb's writ-hearing testimony was spent in applying the principles on memory to B.C.'s particular case. He testified that potentially all of the challenges to memory that he had discussed were at play here. He pointed to several factors and specific events that, in his opinion, should lead a trier of fact to view the reliability of B.C.'s testimony "very skeptically" and with "a great deal of scrutiny." These included: the fact that B.C. was a child, so his memory was not as good as an adult's to begin with; the length of time (seventeen months) for the details to emerge, which is especially long for a child, given that memory degrades over time; the possibility that specific statements and questions from the many people involved may have lead B.C. to reconstruct his memory of the incident; the potential for suggestion from therapists, particularly Judy Parker, if she began B.C.'s treatment with a preconceived idea that he had been sexually abused;[14] the potential influence on B.C.'s memory of the repetition that came from B.C.'s being

---

[14] There is some independent evidence in the trial record to support this premise. For instance, a letter from a previous counselor referring B.C. to Parker discusses the sexual abuse and says, "[B.C.] has been hesitant to disclose anything about his abuse. It has been determined that he has definitely been exposed to deviate sexual

questioned repeatedly by several mental-health professionals, as well as his parents and his minister, and of the pressure this might have placed on him to "remember" things that did not happen; and the possibility that the severe and dangerous emotional problems B.C. had been experiencing might have impacted his memory. Dr. Gottlieb also pointed to statements B.C. made in two Child Protective Services (CPS) interviews as raising further questions about the reliability of B.C.'s testimony. For instance, B.C. told the first CPS interviewer that he was there because his parents told him something happened between him and his uncle and that his uncle had touched his "privates." This statement and several others, Dr. Gottlieb testified, raised the substantial possibility of suggestion having affected B.C.'s memory.

At the writ hearing, trial counsel acknowledged that his defensive strategy had been to attack B.C.'s credibility and his statements as unreliable due to suggestion and coaching. B.C.'s testimony provided the only direct evidence that the applicant committed the alleged sexual assault against him. His testimony was therefore critical to the State's case. Dr. Gottlieb's testimony was critical to the defense, as it was intended to provide the scientific basis to support the entire defensive theory.

Dr. Gottlieb's trial testimony before the jury differed markedly from his writ-hearing testimony, not only in scope but in substance as well. In general, Dr. Gottlieb's writ testimony was far more comprehensive than his trial testimony. The differences between the two cannot be attributed to counsel's trial strategy. The writ record reflects that trial counsel believed at the time

---

behavior." Parker testified that B.C.'s mother had told her, in Parker's initial visit with B.C., that one of the reasons she was seeking treatment for B.C. was to "find out the truth" about the sexual abuse. Parker herself acknowledged on cross-examination that this was one of her goals. Parker also testified that she had already made a diagnosis of sexual abuse by B.C.'s second or third visit with her.

that he was adequately presenting Dr. Gottlieb's theory to the jury. Trial counsel gave no indication that he withheld a portion of the expert evidence from the jury for any strategic reason. Neither can the differences be attributed to restrictions resulting from the trial court's evidentiary rulings. At trial, before Dr. Gottlieb testified for the defense and upon the State's request, the trial court held a proceeding outside the jury's presence, pursuant to Texas Rule of Evidence 705.[15] After hearing the testimony, the trial judge ruled that he would allow all but the testimony "that psychotherapy, in and of itself, can reinforce implanted memory, cause implanted memory, or cause false outcry." But very little, if any, of the writ testimony touched directly on this point. And trial counsel himself admitted at the writ hearing that the ruling in no way hampered his presentation of the testimony, "[b]ecause we never intended to present the theory that therapy inherently causes memory implantation."

At the writ hearing, counsel asked Dr. Gottlieb about the specific knowledge he had in the area of memory. Dr. Gottlieb not only gave details about his own involvement and experience, but also about the extensive research that had been done in the area, including specifics related to memory and abuse in children. At trial, the jury heard only a brief introduction about Dr. Gottlieb's background.

Throughout his writ-hearing testimony, Dr. Gottlieb discussed the scientific basis of concepts in the area of memory and challenges to memory. For instance, responding to counsel, Dr. Gottlieb testified that psychologists had studied memory for over one hundred years and that

---

[15] Rule 705 states, in relevant part:
(b) Voir dire. Prior to the expert giving the expert's opinion or disclosing the underlying facts or data, a party against whom the opinion is offered upon request in a criminal case shall … be permitted to conduct a *voir dire* examination directed to the underlying facts or data upon which the opinion is based. This examination shall be conducted out of the hearing of the jury.

the principles he would be discussing were accepted within the scientific community. In addition, writ counsel asked Dr. Gottlieb to produce scientific articles and studies to support each concept he explained. He further asked about the reputation of the studies' authors and offered each article and study into evidence. At trial, on the other hand, counsel neither questioned Dr. Gottlieb in front of the jury about the research supporting his testimony, nor offered any exhibits into evidence, despite the fact that Dr. Gottlieb had brought to trial most of the articles and studies offered into evidence at the writ hearing. The writ record reflects that trial counsel "spent literally hours" before trial learning from Dr. Gottlieb about memory implantation and the supporting research. Dr. Gottlieb had even prepared an outline for trial counsel containing much of the material covered in the writ hearing. Trial counsel referred to the literature explaining the scientific basis for the testimony only in order to qualify Dr. Gottlieb as an expert, in the Rule 705 hearing outside the presence of the jury.

Another area of difference between the two sets of testimony concerned the application of the concepts about memory to the facts of this case. Writ counsel questioned Dr. Gottlieb extensively about the potential reliability of B.C.'s testimony given the various challenges to memory. Counsel walked the expert through each event in the case leading up to B.C.'s outcry and asked for his opinion about how that might have affected B.C.'s memory in the context of Dr. Gottlieb's previous testimony. In contrast, although trial counsel asked Dr. Gottlieb to apply the principles from his testimony to this particular complainant in the Rule 705 hearing, he failed to do so in front of the jury, despite the fact that the trial court had not prohibited such testimony.

The foregoing comparison of Dr. Gottlieb's trial testimony with his writ-hearing testimony supports a finding that trial counsel's performance was deficient and that this

deficiency cannot be explained or justified as any sort of trial strategy. After reviewing the record of the guilt phase of the trial, we also conclude that the record supports a finding that the applicant was prejudiced by the deficient performance.

The State's case relied chiefly on B.C.'s testimony as the only direct evidence that an offense had occurred and that the applicant was the offender. Because of the length of time between the alleged incident and the report of it, there was no physical evidence in the case.

Of the four people in the applicant's house on the night of the alleged incident, only B.C. could attest to the sexual assault having taken place. B.C.'s sister testified that she slept on the other side of the house with two female cousins and knew nothing of the events. And the testimony of B.C.'s aunt, both as a State's witness and a defense witness, failed to corroborate, and in many places contradicted, B.C.'s testimony.

The possibility of sexual abuse was raised initially by B.C.'s Sunday-school teacher, who testified that B.C. disliked, and actively avoided, being hugged and touched. The teacher thought his behavior to be so unusual and abnormal that she asked B.C.'s mother whether it was possible that someone had molested him. On cross-examination, the teacher acknowledged she had no training in identifying sexual abuse.

According to his parents, B.C. exhibited changes in behavior as a result of the abuse – mood swings and fits of anger, for example, as well as age-inappropriate sexual behavior. B.C.'s parents testified that, some time after the incident, they were approached by the parents of one of B.C.'s friends, who had learned that their son and another boy had been "kissing" each other's penises. When asked who had taught them such behavior, they identified B.C.

Trial testimony revealed that it took many months and numerous visits to a series of therapists and counselors for the details of the incident to emerge and for B.C. to identify the applicant as the offender. Judy Parker, the counselor to whom B.C. finally named the applicant, testified that B.C.'s previous counselor had referred him because she had tried to elicit details of the incident from B.C. but had hit a "dead end." Parker discussed her approach with B.C. and the process by which he gradually told her about the incident, and she recounted for the jury the details of the night in question as B.C. told them to her. Throughout her testimony, Parker characterized B.C.'s behavior and unwillingness to talk about the incident as typical of victims of sexual abuse and said that generally, getting victims to talk about abuse is a process that happens over time. She testified that B.C. met every one of the criteria for post-traumatic stress disorder (PTSD), as set forth in the "DSM" (the Diagnostic and Statistical Manual of Mental Disorders), and that statistics show that the primary cause of PTSD is sexual abuse.

During the defense's case in chief, the applicant's trial counsel adduced evidence clearly targeted at challenging the process by which B.C. ultimately accused the applicant, and in so doing, challenged the reliability of B.C.'s testimony. This evidence included testimony from Claudia King, a CPS social worker who conducted a forensic interview with B.C. several months after he had started working with Parker. King testified that she had concerns that B.C. had been influenced by a therapist, based on the language he used to describe the incident, and that his recounting lacked details. In response to a question from defense counsel, King said it was possible for B.C.'s parents to have influenced him, but she had no information that they had done so. On cross-examination, she acknowledged that an outcry can be a process, and that it is not unusual for a child to reveal more details as time goes on.

It was Dr. Gottlieb's testimony, however, that was essential to the defense, as it would have provided the scientific underpinning for its case. Dr. Gottlieb was the only defense witness who was in a position to lend credence to the concept of memory implantation and bring professional expertise to bear in order to challenge B.C.'s version of the events. Given the importance of B.C.'s testimony to the State's case and the significance of Dr. Gottlieb's testimony in sustaining the defensive theory, we conclude that there is a reasonable probability that, but for trial counsel's error, the result of the trial would have been different.

The record clearly supports the convicting court's findings, which will be accepted by this court. We find, as did the convicting court, that counsel's performance was deficient and that this performance prejudiced the applicant's defense. Having so found as to the applicant's first claim, we need not reach his remaining claims.

Relief from the judgment of conviction is granted. The applicant is remanded to the custody of the Dallas County Sheriff to answer the charge set out in the indictment.

Delivered March 11, 2009.
Do not publish.