# NO. 12-23-00244-CR

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *DES BERNARD SHELBY, APPELLANT* | *§* | *APPEAL FROM THE 159TH* |
| *V.* | *§* | *JUDICIAL DISTRICT COURT* |
| *THE STATE OF TEXAS, APPELLEE* | *§* | *ANGELINA COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

Des Bernard Shelby appeals his conviction for murder. In eight issues, Appellant contends he received ineffective assistance of counsel. We affirm the trial court's judgment.

## BACKGROUND

Appellant was charged by indictment with the murder of Jermaine Oliphant. Appellant waived his right to a jury trial, pleaded "not guilty," and the matter proceeded to a bench trial.

Wade Finley testified that Appellant is a friend of his who sometimes visited his house. On the day of the murder, Appellant and Oliphant came to the residence, and Wade's brother (Wesley), and his father's girlfriend, Jonnie Clowers, were also present. According to Wade, he, Wesley, Oliphant, and Appellant played dominoes for a couple of hours, and Appellant eventually left the table and went to the back of the house. When Appellant returned to the front of the house, Wade heard a gunshot, and Appellant said to Oliphant, "You got my $20." Wade explained that Oliphant denied having Appellant's money, and then "[Oliphant] got shot." Wade testified that he jumped up from the table, Oliphant fell on him, and he and Oliphant fell into a china cabinet. Wade attempted to resuscitate Oliphant.

According to Wade, Clowers entered the room and asked what happened, and Wesley told her that Appellant "just shot" Oliphant. Wade explained that the gun used in the shooting, an AR-style rifle, belonged to him, and before the shooting, the gun was in his room. The men moved Oliphant from the kitchen to the living room, and Wesley called 911. Wade testified that Appellant instructed him and Wesley to tell the police "that somebody came and shot through the window to the door[,]" and Appellant threatened to harm them if they did not do so. When officers arrived, Appellant, Wesley, and Wade told them that an unknown person fired a shot through the door. Wade testified that the district attorney agreed not to charge him with any offense related to the shooting of Oliphant in exchange for his testimony, and he explained that he is currently in jail because he is charged with an unrelated murder.

During cross-examination, Wade denied being intoxicated, drinking alcohol, or taking drugs on the night of the shooting, but admitted that he probably appeared to be intoxicated. When defense counsel questioned Wade about facing a sentence of life in prison for the unrelated murder and asked, "That means you want to make the State happy[?]", Wade responded negatively and testified, "I don't need a lighter sentence . . . when I am innocent." Wade explained that he owns a 9mm gun, but he denied knowing that a 9mm cartridge was found underneath the table on the night of the shooting. Wade testified that he sold drugs, and he owned the AR-style gun to protect himself. Wade denied taking the rifle from Appellant after the shooting and giving it to Wesley. But when defense counsel stated that Clowers claimed to have a recording on which Wesley told her he did so, Wade testified that Clowers is lying. According to Wade, Appellant put the rifle in an unlocked shed at the residence. Wade's father, Kerwin Finley, testified to finding the rifle in the shed and selling it. According to Kerwin, police searched the shed after the shooting but did not find the rifle at that time. When Kerwin saw Appellant after he bonded out of jail and asked Appellant what happened, Appellant "kept saying he had to do it."

Officer Sterling Linebaugh of the Diboll Police Department responded to a call regarding a gunshot victim at a residence. When Linebaugh arrived, he saw Oliphant lying in the living room, and Appellant, Wesley, and Wade were standing behind Oliphant. Appellant and Wade told Linebaugh that a shot came through the door of the residence. Linebaugh observed that Wade appeared to be intoxicated, but Appellant did not. Upon patting Appellant down for weapons, Linebaugh found two pills, which he recognized as Xanax, in a small wooden box, and Linebaugh found a 9mm shell under the table. Wade was found to be in possession of approximately eighty

2

Xanax pills.  After reading each of the men their *Miranda* rights, Linebaugh interviewed them, and his body camera recorded the interviews.

Norman Williams, the assistant chief of the Diboll Police Department, also responded to the scene.  Williams explained that the residence is a well-known drug house and other shootings had occurred there.  After examining the front door of the residence, Williams concluded that the version of events related by Appellant, Wade, and Wesley was not possible.  According to Williams, the door was glass at the top and its bottom was solid, but a pane was missing from the middle.  Because no glass was broken and there was no hole through the solid portion of the door, a shot through the door would have come through the missing pane.  Williams explained that "[t]o shoot through the missing pane at the table where they were located, you would have had to squat down and look through the glass and shoot, which would have put you shooting through a couch that was in front of the table, [and] the couch did not allow you to see the occupants or the table."  Williams testified that the couch was undamaged and there was no impact on the wall behind the table where the victim, Wade, and Wesley were previously sitting.  Williams found various bullet holes, some of which appeared to have resulted from prior shootings, and attempted to locate and recover the rounds, but he was unable to do so.

Williams ultimately interviewed Appellant after reading him his *Miranda* rights, and audio and video recordings of the interview were admitted into evidence.  During the interview, Appellant told Williams that he fell asleep in a chair at the residence, and when he awoke, Oliphant's hand was in his pocket, and he then shot Oliphant with the AR-15 rifle.  Williams attended the autopsy of Oliphant, and he explained that the scenario Appellant described would not produce a wound consistent with Oliphant's wound.  Williams explained that when he spoke to Clowers, she was cooperative, and "she had a recording on her cell phone of talking to Wade Finley about the incident."

According to Williams, Wade eventually told him that Appellant and Oliphant got into an argument, and Appellant left the room and returned with a weapon, and when Oliphant stood up, Appellant shot him.  During cross-examination, Williams explained that he believed Wade, Wesley, and Appellant "all stashed the gun."  When defense counsel asked whether Wade admitted being intoxicated, Williams testified, "You could tell . . . that they were all – that they [had] been doing something[.]"  Additionally, when defense counsel asked Williams whether "their judgment

3

about where people might be standing and what might've happened" therefore might not be "100 percent reliable[,]" Williams agreed.

During Appellant's arrest, when he was not being questioned, he volunteered "that the shooting was in self-defense." The arresting officer, Mark Fulcher, explained that he "told [Appellant], pretty much, to hush." While strip searching Appellant at the jail, correctional officer Ethan Garsee saw a .223-caliber shell casing fall from Appellant's underwear. According to Garsee, when the shell casing fell, Appellant "pleaded and begged" him not to tell anyone about the bullet casing. Garsee collected Appellant's clothing and the shell casing as evidence.

At one point during the trial, defense counsel stated to the judge, "One of the other key players here is . . . Jonnie Clowers. I was assuming she was going to be a witness for the State. The State has subpoenaed her to be here[.]" The district attorney offered to contact Clowers and instruct her to come to testify for the defense without the necessity of issuing and serving a subpoena, and defense counsel asked the district attorney to have someone give him Clowers's phone number. Defense counsel stated, "if [the State] doesn't call her, then I will be calling her in my case in chief." Defense counsel ultimately did not call Clowers, or any other witnesses, to testify.

Christopher Cheney, a gunshot residue analyst for the Texas Department of Public Safety, testified that Appellant "had one characteristic and two indicative gunshot primer residue particles[,]" Wade had one indicative gunshot residue particle, and Wesley "had one characteristic and four indicative gunshot primer residue particles[.]" Cheney explained that either Wesley or Appellant may have fired a weapon, been in close proximity to a weapon when it was fired, or touched a surface that transferred gunshot primer residue particles to their hands. According to Cheney, Wade "did not fire or handle a weapon[;]" rather, the particles "originated from [a] non-GSR source[.]" Cheney agreed that gunshot residue could transfer to someone who tried to aid or move a gunshot victim.

Dr. Selly Rae Strauch, the chief forensic pathologist for forensic medical management services in Texas, testified that her facility performed an autopsy of Oliphant. Strauch explained that the cause of Oliphant's death was a gunshot wound of the chest. Strauch explained that Oliphant had multiple superficial sharp force trauma wounds to his chest, but those wounds were unrelated to his cause of death. According to Strauch, Oliphant's sharp force trauma wounds were

4

"yellow, meaning that these wounds were done in a postmortem state, meaning that the decedent's heart was no longer beating."

After the State rested, defense counsel stated:

> Your Honor, I have spent the last 15, 20 minutes talking to my client about various issues, including whether he wanted to take the stand and testify in his own defense. We discussed that thoroughly, the pros and the cons, and he has decided not to take the stand. He is going to invoke his right to remain silent at this trial. And, Your Honor, we are going to rest at this time. We are not going to have any additional witnesses.

During his closing argument, defense counsel argued that Wade's testimony, upon which the State "relied heavily[,]" was not credible. Defense counsel argued that Wade is "a convicted liar, . . . someone who did lie to the police in this case. . . . Someone who is facing life in prison for a murder charge and presumably would do anything to testify the way the State wants him to testify so he can try to get some kind of benefit in his case." Additionally, counsel pointed out that on the night of the shooting, Wade and Wesley were placed in the same patrol unit, "where they could sit . . . and coordinate their stories." Defense counsel also argued that reasonable doubt exists, and he asserted, "[w]e have a bunch of drugs, we have a bunch of guns, we have a bunch of people lying[,] and everybody is intoxicated, [there are] multiple stories, some of the evidence doesn't make sense . . . ." In addition, defense counsel argued that deadly force can be used to defend property, and "we have a victim going through [Appellant's] pockets." Defense counsel further argued that evidence on self-defense can come from any source, including police reports, and that a defendant need not take the stand to assert self-defense.

The trial court ultimately found Appellant "guilty" of murder. After ordering a pre-sentence investigation report and conducting a sentencing hearing, the trial court sentenced Appellant to imprisonment for seventy-two years. This appeal followed.

### INEFFECTIVE ASSISTANCE OF COUNSEL

In eight issues, Appellant complains that trial counsel provided ineffective assistance because counsel failed to (1) allow Appellant to assert that he acted in self-defense, (2) adequately address or emphasize the State's cooperation agreement with Wade and Wesley, (3) adequately challenge Wade's credibility and alleged motive, (4) address the "stab" wounds on the victim's chest, (5) address the Finley family "band[ing] together" to "blame" Appellant, (6) call two "key"

5

witnesses, Clowers and Wesley, to testify, (7) effectively address a 9 mm bullet found at the scene, and (8) determine whether Wade and Appellant could clearly recall the events that led to the shooting, since both of them were intoxicated.[1]  According to Appellant, trial counsel generally "failed to offer alternate theories of the case involving co-defendants and their role in the murder." Because all of Appellant's issues assert that trial counsel provided ineffective assistance, we will address them together.

**Applicable Law**

To prevail on a claim of ineffective assistance of counsel, an appellant must satisfy a two-pronged test:

> First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984); *Hernandez v. State*, 726 S.W.2d 53, 56-57 (Tex. Crim. App. 1986).  Under the first prong of the *Strickland* test, an appellant must demonstrate that counsel's performance was deficient, which requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment.  *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064; *Tong v. State*, 25 S.W.3d 707, 712 (Tex. Crim. App. 2000).  An appellant must demonstrate that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms.  *See Strickland*, 466 U.S. at 688, 104 S. Ct. at 2064-65; *Tong*, 25 S.W.3d at 712.

"Appellate review of defense counsel's representation is highly deferential and presumes that counsel's actions fell within the wide range of reasonable and professional assistance." *Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002); *see Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065.  An appellant must prove that there was no plausible professional reason for his counsel's specific acts or omissions.  *Bone*, 77 S.W.3d at 836. "Any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged

---

[1] Appellant's initial statement of issues in his brief does not precisely match the issues and arguments stated in the body of his brief.  For clarity, we state the issues as set forth by Appellant in his initial statement of issues.

ineffectiveness." ***Thompson v. State***, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999) (citing ***McFarland v. State***, 928 S.W.2d 482, 500 (Tex. Crim. App. 1996)). The bare record on direct appeal is generally insufficient to demonstrate that "counsel's representation was so deficient . . . as to overcome the presumption that counsel's conduct was reasonable and professional." ***Bone***, 77 S.W.3d at 833 (footnote omitted).

Under the second ***Strickland*** prong, an appellant must show that counsel's deficient performance prejudiced the defense. ***Strickland***, 466 U.S. at 687; 104 S. Ct. at 2064; ***Tong***, 25 S.W.3d at 712. To succeed, an appellant must demonstrate a reasonable probability that but for his counsel's unprofessional errors, the outcome of his trial would have been different. ***Strickland***, 466 U.S. at 694, 104 S. Ct. at 2068; ***Bone***, 77 S.W.3d at 833; ***Tong***, 25 S.W.3d at 712. It is not enough for an appellant to show that the errors "had some conceivable effect on the outcome of the proceedings." ***Burruss v. State***, 20 S.W.3d 179, 186 (Tex. App.—Texarkana 2000, pet. ref'd). To prevail, an appellant must prove both prongs of the ***Strickland*** test by a preponderance of the evidence. ***Tong***, 25 S.W.3d at 712. Therefore, failure to make the required showing of either deficient performance or sufficient prejudice defeats a claim of ineffective assistance of counsel. ***Rylander v. State***, 101 S.W.3d 107, 110 (Tex. Crim. App. 2003); ***Thompson***, 9 S.W.3d at 813.

## Analysis

As discussed in detail above, defense counsel stated on the record that he consulted with Appellant, and they decided together that Appellant would not testify. During his closing argument, counsel argued for both self-defense and defense of property. The record also shows that defense counsel both cross-examined Wade regarding his cooperation agreement with the State and argued during his closing that Wade's testimony was not credible due to his cooperation with the State and his intoxication on the night of the shooting. Moreover, the record shows that defense counsel questioned Wade regarding the 9mm bullet and argued that the Finleys coordinated their stories against Appellant. The record does not reveal why defense counsel ultimately elected not to call Clowers or Wesley to testify and decided not to emphasize the 9mm bullet or the superficial post-mortem sharp force trauma wounds on Oliphant's chest more extensively.

Appellant did not file a motion for new trial or otherwise create a record elucidating counsel's possible reasons for the alleged acts and omissions of which Appellant complains. We must presume that counsel's conduct fell within the wide range of reasonable and professional

representation. *See* ***Strickland***, 466 U.S. at 689, 104 S. Ct. at 2065; ***Bone***, 77 S.W.3d at 833. With a silent record, we cannot presume that counsel's conduct constituted ineffective assistance. *See* ***Bone***, 77 S.W.3d at 833; ***Thompson***, 9 S.W.3d at 813. The record does not demonstrate that defense counsel's performance was the product of an unreasoned or unreasonable trial strategy. *See* ***Bone***, 77 S.W.3d at 834. We conclude that Appellant fails to demonstrate that trial counsel made errors so serious that he was not functioning as the "counsel" guaranteed by the Sixth Amendment. *See* ***Strickland***, 466 U.S. at 687, 104 S. Ct. at 2064; ***Tong***, 25 S.W.3d at 712. Moreover, assuming without deciding that counsel's performance was deficient, Appellant fails to establish that, but for counsel's alleged errors and omissions, the outcome of his trial would have been different. *See* ***Strickland***, 466 U.S. at 687, 104 S. Ct. at 2064; ***Bone***, 77 S.W.3d at 833. We therefore conclude that Appellant fails to demonstrate either prong of the two-pronged ***Strickland*** test. *See* ***Strickland***, 466 U.S. at 687, 104 S. Ct. at 2064; ***Rylander,*** 101 S.W.3d at 110; ***Thompson,*** 9 S.W.3d at 813. Accordingly, we overrule issues one, two, three, four, five, six, seven, and eight.

## DISPOSITION

Having overruled each of Appellant's issues, we ***affirm*** the trial court's judgment.

JAMES T. WORTHEN
Chief Justice

Opinion delivered July 31, 2024.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(DO NOT PUBLISH)

8



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**JULY 31, 2024**

**NO. 12-23-00244-CR**

**DES BERNARD SHELBY,**
Appellant
V.
**THE STATE OF TEXAS,**
Appellee

Appeal from the 159th District Court
of Angelina County, Texas (Tr.Ct.No. 2021-0796)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED, and DECREED that the judgment of the court below **be in all things affirmed**, and that this decision be certified to the court below for observance.

James T. Worthen, Chief Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*